## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

TARYN DIETRICH, on behalf of herself and
a class of all those similarly situated,

        Plaintiff,

    v.

C.H. ROBINSON WORLDWIDE, INC.,

        Defendant.

Case No. 18-CV-04871

Hon. Ronald A. Guzman

## C.H. ROBINSON'S MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

Gerald L. Maatman, Jr., IL No. 6181016
(gmaatman@seyfarth.com)
Christina M. Janice, IL No. 6326099
(cjanice@seyfarth.com)
Michael L. DeMarino, IL No. 6298337
(mdemarino@seyfarth.com)
SEYFARTH SHAW LLP
233 South Wacker
Chicago, IL  60606
Phone: 312-460-5000
Fax:    312-460-7000
*Attorneys for Defendant*

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   RELEVANT FACTUAL BACKGROUND ............................................... 3

    A.    CHRW's Business Operations Are Broad ......................................... 3

    B.    The Carrier Sales Employee Positions Are Entrepreneurial And Diverse ............ 4

    C.    Hours Worked By CSEs Were Variable And At The Discretion Of Each General Manager If Not The CSE Herself/Himself................................................. 9

    D.    Data "Proxies" Are Insufficient To Overcome Individual Inquiries ................... 10

III.  ARGUMENT ............................................................................................ 11

    A.    Plaintiff Cannot Satisfy The More Stringent Rule 23 Standard .......................... 11

    B.    Plaintiff Fails To Satisfy The Requirements Of Rule 23(a) ................................. 12

        1.    Plaintiff Fails To Establish There Are Common Questions Of Law Or Fact ............................................................ 13

        2.    Plaintiff's Personal Claims Preclude Satisfaction Of The Typicality And Adequacy Requirements .................................. 16

    C.    Plaintiff Cannot Meet The Predominance Requirements Of Rule 23(b)(3) Because Resolving Her Claims Requires Individualized Analysis ..................... 20

        1.    Individualized Fact Inquiries Are Required To Determine If Each Employee Meets The Administrative Exemption..................................... 21

        2.    Individualized Fact Inquiries Are Needed To Determine Employees' Primary Duties and Whether They Exercised Discretion ................................................. 22

            a.    Variations In Actual Job Functions Require Individualized Inquiries To Ascertain *Each* Employee's Primary Duties........... 23

            b.    Substantial Variations Exist Regarding The Extent To Which Employees Exercised Independent Judgment Or Discretion ................................................. 25

        3.    Plaintiff Cites No Authority To Show That Common Questions Predominate .............................................. 26

i

4.    Assessing Whether Class Members Performed "Sales Work" Requires An Individualized Analysis ........................................................ 28

D.    Damages And Liability Cannot Be Determined On A Class-Wide Basis ............ 30

E.    The Class Action Method Is Not Superior Under Rule 23(b)(3) .......................... 32

1.    Class Members Have An Interest To Individually Control The Litigation ........................................................................................... 33

2.    Plaintiff Offers No Trial Plan That Addresses Manageability Problems .......................................................................................... 33

3.    Resolving The FLSA Collective Action Claims And The Rule 23 Claims Simultaneously Undercuts The Rule 23(b)(3) Superiority Factors .............................................................................................. 34

IV.    CONCLUSION ............................................................................................. 35

60181591v.4

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alakozai v. Chase Inv. Servs. Corp.*,
  No. 11-CV-09178 SJO JCX, 2014 WL 5660697 (C.D. Cal. Oct. 6, 2014) ............................22

*Allen v. City of Chicago*,
  828 F. Supp. 543 (N.D. Ill. 1993) ...........................................................................................19

*Am. Pipe & Const. Co. v. Utah*,
  414 U.S. 538 (1974) .................................................................................................................20

*Amchem Prods., Inc v. Windsor*,
  521 U.S. 591 (1997) ...........................................................................................................16, 20

*In Re Bank of Am.*,
  286 F.R.D. 572 (D. Kan. 2012) ....................................................................................12, 13, 20

*Bell v. PNC Bank, Nat. Ass'n*,
  800 F.3d 360 (7th Cir. 2015) ...................................................................................................32

*Bunyan v. Spectrum Brands, Inc.*,
  No. 07-CV-0089-MJR, 2008 WL 2959932 (S.D. Ill. Jul. 31, 2008) ......................................15

*Campbell v. City of Los Angeles*,
  903 F.3d 1090 (9th Cir. 2018) .................................................................................................27

*Carlson v. C.H. Robinson Worldwide, Inc.*,
  No. CIV 02-3780 JNE/JJG, 2006 WL 2830015 (D. Minn. Sept. 26, 2006) ...........................21

*CE Design Ltd. v. King Architectural Metals, Inc.*,
  637 F.3d 721 (7th Cir. 2011) ..............................................................................................16, 17

*Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*,
  797 F.3d 426 (7th Cir. 2015) ...................................................................................................32

*Chin v. Chrysler Corp.*,
  182 F.R.D. 448 (D.N.J. 1998) ..................................................................................................33

*Clark v. Experian Info. Sols., Inc.*,
  256 F. App'x 818 (7th Cir. 2007) .............................................................................................28

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ...................................................................................................................31

60181591v.4

*Cruz v. Lawson Software, Inc.*,
    764 F. Supp. 2d 1050 (D. Minn. 2011) .................................................................................15

*Dailey v. Groupon, Inc.*,
    No. 11 C 05685, 2014 WL 4379232 (N.D. Ill. Aug. 27, 2014) ...................................... *passim*

*Davidson v. Citizens Gas & Coke Util.*,
    238 F.R.D. 225 (S.D. Ind. 2006) ..........................................................................................28

*De Asencio v. Tyson Foods, Inc.*,
    342 F.3d 301 (3d Cir. 2003) .................................................................................................35

*De La Riva v. Houlihan Smith & Co.*,
    848 F. Supp. 2d 887 (N.D. Ill. 2012) ...................................................................................34

*DeWalt v. Greencroft Goshen, Inc.*,
    902 F. Supp. 2d 1127 (N.D. Ind. 2012) .....................................................................28, 29, 30

*Diaz v. Elecs. Boutique of Am., Inc.*,
    No. 04-CV-0840E(SR), 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ................................15

*Ervin v. OS Rest. Servs., Inc.*,
    632 F.3d 971(7th Cir. 2011) ...........................................................................................34, 35

*Espenscheid v. DirectSat USA, LLC*,
    No. 09-CV-625-BBC, 2011 WL 2009967 (W.D. Wis. May 23, 2011) .......................... *passim*

*Farmer v. DirectSat USA, LLC*,
    No. 08 CV 3962, 2013 WL 2457956 (N.D. Ill. June 6, 2013) ..........................................31, 32

*Fisher v. Bristol-Myers Squibb Co.*,
    181 F.R.D. 365 (N.D. Ill. 1998) ...........................................................................................33

*In Re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*,
    No. 14-CV-5696, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017)............................................32

*Franks v. MKM Oil, Inc.*,
    No. 10 CV 00013, 2012 WL 3903782 (N.D. Ill. Sept. 7, 2012)............................................32

*Gen. Tele. Co. of the Sw. v. Falcon*,
    457 U.S. 147 (1982).......................................................................................................12, 16

*Grayson v. K Mart Corp.*,
    79 F.3d 1086 (11th Cir. 1996) ..............................................................................................27

*Green v. Harbor Freight Tools USA, Inc.*,
    888 F. Supp. 2d 1088 (D. Kan. 2012) ...................................................................................15

iv

*Hansberry v. Lee*,
    311 U.S. 32 (1940) ........................................................................................16

*Helfand v. Cenco, Inc.*,
    80 F.R.D. 1 (N.D. Ill. 1977) ....................................................................17, 18

*Hill v. R+L Carriers*,
    No. C 09-1907 CW, 2011 WL 830546 (N.D. Cal. Mar. 3, 2011) ...........................21

*Hudgins v. Total Quality Logistics, LLC*,
    No. 16 C 7331, 2019 WL 354958 (N.D. Ill. 2019) .........................................27, 28

*Hundt v. Direct Sat USA, LLC*,
    294 F.R.D. 101 (N.D. Ill. 2013) ................................................................21, 25

*Ivery v. RMH Franchise Corp.*,
    280 F. Supp. 3d 1121 (N.D. Ill. 2017) ...........................................................12

*J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*,
    628 F.2d 994 (7th Cir. 1980) .........................................................................17

*Jamison v. First Credit Servs., Inc.*,
    No. 12 C 4415, 2013 WL 3872171 (N.D. Ill. July 29, 2013) ...............................28

*Jiminez v. Domino's Pizza, Inc.*,
    238 F.R.D. 241 (C.D. Cal. 2006) ...................................................................22

*Johnson v. Bond*,
    94 F.R.D. 125 (N.D. Ill. 1982) ......................................................................19

*Johnson v. Pinstripes, Inc.*,
    No. 12 C 1018, 2013 WL 5408657 (N.D. Ill. Sept. 26, 2013) ..............................27

*Koehler v. Freightquote.com, Inc.*,
    No. 12-CV-2505-DDC-GLR, 2015 WL 4203962 (D. Kan. July 10, 2015) ............24

*Koos v. First National Bank*,
    496 F.2d 1162 (7th Cir. 1974) .......................................................................17

*Laughlin v. Jim Fischer, Inc.*,
    No. 16-C-1342, 2018 WL 2538356 (E.D. Wis. June 4, 2018) ..............................27

*Mace v. Van Ru Credit Corp.*,
    109 F.3d 338 (7th Cir. 1997) .........................................................................33

*Marting v. Crawford & Co.*,
    No. 00 C 7132, 2006 WL 681060 (N.D. Ill. Mar. 14, 2006) ...............................30

60181591v.4

*Mckinnon v. Dollar Thrifty Auto. Grp., Inc.*,
    No. 12-CV-04457-YGR, 2016 WL 879784 (N.D. Cal. Mar. 8, 2016) ..................................18

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ..................................................................................20, 26, 27

*Muro v. Target Corp.*,
    580 F.3d 485 (7th Cir. 2009) ..........................................................................................19

*Nehmelman v. Penn Nat. Gaming, Inc.*,
    822 F. Supp. 2d 745 (N.D. Ill. 2011) ..............................................................................12

*O'Brien v. Ed Donnelly Enterprises, Inc.*,
    575 F.3d 567 (6th Cir. 2009) ..........................................................................................27

*Oetinger v. First Residential Mortg. Network, Inc.*,
    No. CIV. 3:06-CV-381, 2009 WL 2162963 (W.D. Ky. Jul. 16, 2009) ..................................15

*Pavone v. Aegis Lending Corp.*,
    No. 05 C 1529, 2006 WL 2536632 (N.D. Ill. Aug. 31, 2006) ..................................20

*Randall v. Rolls-Royce Corp.*,
    637 F.3d 818 (7th Cir. 2011) ..........................................................................................19

*Retired Chicago Police Ass'n v. City of Chicago*,
    7 F.3d 584 (7th Cir. 1993) ..............................................................................................16

*Rodolico v. Unisys Corp.*,
    199 F.R.D. 468 (E.D.N.Y. 2001) ..................................................................................27

*Roe-Midgett v. CC Servs., Inc.*,
    512 F.3d 865 (7th Cir. 2008) ......................................................................................23, 30

*Romero v. H.B. Automotive Grp., Inc.*,
    No. 11 CIV. 386, 2012 WL 1514810 (S.D.N.Y. May 1, 2012) ..................................15

*Schaefer-LaRose v. Eli Lilly & Co.*,
    679 F.3d 560 (7th Cir. 2012) ..........................................................................13, 24, 26, 29

*In Re Schering Plough Corp. ERISA Litig.*,
    589 F.3d 585 (3d Cir. 2009)..........................................................................................19

*Sepulveda v. Wal-Mart Stores*,
    237 F.R.D. 229 (C.D. Cal. 2006) ..................................................................................22

*Shaw v. Prentice Hall Computer Pub., Inc.*,
    151 F.3d 640 (7th Cir. 1998) ..........................................................................................30

vi

*Smith v. Family Video Movie Club, Inc.*,
 311 F.R.D. 469 (N.D. Ill. 2015).........................................................................12

*Spainhower v. U.S. Bank Nat'l Ass'n*,
 No. 2:08-CV-00137-JHN-PJWx, 2010 WL 1408105 (C.D. Cal. Mar. 25,
 2010) .............................................................................................................22

*Strait v. Belcan Eng'g Grp., Inc.*,
 911 F. Supp. 2d 709 (N.D. Ill. 2012) ....................................................................26

*Susman v. Lincoln Am. Corp.*,
 561 F.2d 86 (7th Cir. 1977) ................................................................................18

*Tamas v. Family Video Movie Club, Inc.*,
 No. 11 C 1024, 2013 WL 4080649 (N.D. Ill. Aug. 13, 2013)............................12, 22

*Till v. Saks, Inc.*,
 No: C-11-00504 SBA, 2013 WL 5755671 (N.D. Cal. Sept. 30, 2013)......................15

*Van v. Ford Motor Co.*,
 No. 14-CV-8708, 2019 WL 3976370 (N.D. Ill. Aug. 22, 2019) ..................16, 18, 19

*Verkuilen v. MediaBank, LLC*,
 646 F.3d 979 (7th Cir. 2011) ..............................................................................23

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011)...............................................................................12, 13, 14

*Warner v. Little John Transportation Servs., Inc.*,
 No. 5:19-CV-05042, 2019 WL 3331797 (W.D. Ark. July 24, 2019).......................35

*In Re Wells Fargo Home Mortg. Overtime Pay Litig.*,
 571 F.3d 953 (9th Cir. 2009) ..............................................................................15

*Weston v. Emerald City Pizza, LLC*,
 137 Wash. App. 164 (Wash. App. 2007).................................................................16

*Williams v. Angie's List, Inc.*,
 223 F. Supp. 3d 779 (S.D. Ind. 2016) ...................................................................27

*Zinser v. Accufix Research Inst., Inc.*,
 253 F.3d 1180 (9th Cir.) ......................................................................................34

**Statutes**

820 ILCS § 105/4a (1) .............................................................................................22

820 ILCS § 105/4a (2)(E) ....................................................................................22, 23

28 U.S.C. § 1367(c)................................................................................................35

29 U.S.C. § 213(a)(1)............................................................................................13

29 U.S.C. § 216(b)............................................................................................11, 27

Americans with Disabilities Act of 1990.......................................................16, 17

Fair Labor Standards Act of 1938.............................................................. *passim*

Illinois Minimum Wage Law...................................................................... *passim*

## Other Authorities

29 C.F.R. § 541.200(a)..........................................................................................13

29 C.F.R. § 541.600(a)..........................................................................................13

29 CFR § 541.2(a)(1).............................................................................................22

29 CFR § 541.2(b)............................................................................................22, 25

29 CFR § 541.103..................................................................................................24

29 CFR § 541.205(b).......................................................................................23, 24

29 CFR § 541.206(b)..............................................................................................24

69 FR 22122-01...............................................................................................29, 30

Fed. R. Civ. P. 23....................................................................................... *passim*

Fed. R. Civ. P. 23(a) ..................................................................................12, 20, 32

Fed. R. Civ. P. 23(a)(2)....................................................................................13, 16

Fed. R. Civ. P. 23(a)(3)..................................................................................2, 16, 20

Fed. R. Civ. P. 23(a)(4)..............................................................................2, 16, 18, 20

Fed. R. Civ. P. 23(b)(3)....................................................................20, 27, 32, 34

Fed. R. Civ. P. 23(b)(3)(A)...................................................................................33

Fed. R. Civ. P. 23(b)(3)(A)-(D)............................................................................32

Fed. R. Civ. P. 23(c)(4)..........................................................................................32

60181591v.4

## I.    **INTRODUCTION**

Although there is virtually no interest in this lawsuit – with only nine Opt-ins – Plaintiff's counsel nonetheless now seeks to certify a 96-member Rule 23 class, sprawling across five different job positions[1] that serve eight unique teams supervised at various times by more than 10 General Managers ("GMs"). The central issue in Plaintiff's Renewed Motion for Class Certification ("Motion") is whether Defendant C.H. Robinson Worldwide, Inc. ("CHRW") misclassified Plaintiff Dietrich and the proposed class members as exempt under the Illinois Minimum Wage Law ("IMWL"). Resolving this issue on a class-wide basis is impossible as a matter of law because CHRW's business model encourages and incentivizes all CSEs to exercise independent judgment and discretion to build individual portfolios. Moreover, CHRW organizes CSEs into small groups under General Managers ("GM") who as a matter of company policy exercise discretion in developing and managing CSEs, and setting their work schedules. These facts are inconsistent with Plaintiff's theory of uniformity for these five job categories.

The deficiencies in Plaintiff's motion demonstrate why adjudication of Plaintiff's misclassification claim, and CHRW's administrative exemption defense, require highly individualized inquiries, rendering class-wide proof impossible and a class-wide trial unmanageable. Plaintiff's Motion asserts that all class members perform the same primary duty – booking freight. Plaintiff cherry picks this "primary duty" to fit her certification theory in disregard of the multiple duties that are "primary" to each of the CSE positions. Further, Plaintiff omits record evidence that CHRW does not set a mandatory schedule for the CSEs but, rather, directs that their work schedules will be set by their GMs. Finally, Plaintiff doubles-down on her

---

[1] Plaintiff's proposed class includes Carrier Representatives (also referred to as "Buyers" or "Assistant Carrier Account Managers"); Carrier Account Managers ("CAMs"); and Senior Carrier Account Managers ("SCAMs"). These positions are referred to collectively as "CSEs."

1

allegation that all CSEs are required to work a 50-hour per week shift plus weekends, a contention contradicted by GMs and the workforce data produced in discovery. Plaintiff's selective and incomplete presentation of facts ensures that individualized issues will predominate. Thus, Plaintiff fails to meet Rule 23's commonality and predominance requirements.

In addition, Plaintiff's four individual discrimination claims are not typical of the putative class members' misclassification claims, creating conflicts and preventing Plaintiff from adequately protecting the interests of the proposed class. Her claims, driven by her complaints about her own GM, and CHRW's defenses, will become the primary focus at trial, potentially jeopardizing the due process rights and prejudicing the claims of absent class members, and leaving any judgment susceptible to collateral attacks. This outcome is precisely what the typicality and adequacy requirements of Rule 23(a)(3) and (4) were designed to prevent.

Finally, a class action is not a superior method of adjudication in this instance because potential class members are highly compensated professionals whose individual claims, if any, are not served by representative litigation. Class treatment also is not superior given the tension between the opt-in and opt-out procedures of the FLSA and Rule 23, with a putative class of individuals that is ten times the size of the 9-person conditionally certified opt-in collective action. If certified, the Rule 23 state law claims will "substantially predominate" such that the Court should decline to exercise supplemental jurisdiction over them. For these reasons, Plaintiff's Motion For Class Certification should be denied.[2]

---

[2] Declaration of Gerald L. Maatman Jr., with Ex. A: Decl. of J. Hoffman; Ex. B: March 28, 2019 Dep. Tr. of L. Vigeant; Ex. C: Decl. of J. Ormond; Ex. D. Decl. of A. Black; Ex. E Dep. Tr. of E. Herchenroether; Ex. F: Decl. of R. Yari Johnson; Ex. G: Decl. of C. Ryndak; Ex. H: Decl. of A. Arreguin; Ex. I: Dep. Tr. of S. O'Sullivan; Ex. J: Decl. of J. Theil; Ex. K: Dep. Tr. of D. Roscich; Ex. L: November 5, 2019 Dep. Tr. of L. Vigeant; Ex. M: Dep. Tr. of T. Dietrich; Ex. N: Dep. Tr. of E. Simon; Ex. O: Decl. of N. Corrigan.

## II.     RELEVANT FACTUAL BACKGROUND

### A.     CHRW's Business Operations Are Broad

CHRW is a third party transportation logistics company providing a combination of freight transportation services, logistics solutions, and supply chain services to companies through global transportation and distribution networks.[3] CHRW contracts with motor carriers (and other transportation companies) to arrange the transport of its customers' freight.[4] Depending on its customers' supply chain needs, CHRW researches, selects, and advises on the appropriate transportation mode for shipments.[5] CHRW profits from the difference between what it charges to its customers for the totality of these services and what CHRW pays its carriers.[6]

Contrary to Plaintiff's mischaracterization of the record, CHRW employees do far more than "book freight." (ECF No. 147 at 2-3.) CHRW's services range from commitments on a specific shipment to developing comprehensive and integrated relationships. The CSEs worked in CHRW's North American Surface Transportation ("NAST") business segment, which provides value-added logistics services, such as freight consolidation, supply chain consulting and analysis, optimization, and reporting across North America.[7] NAST operates through two distinct units, including its "customer" operations and its "carrier" operations.[8]

On the customer side of NAST, CHRW develops relationships with its customers through its Customer Representatives, who cultivate additional business from existing customers and pursue new customers based on the market and the range of services that CHRW provides.[9]

---

[3] Hoffman Decl. ¶ 4.
[4] *Id*. at ¶ 5.
[5] *Id*.
[6] *Id*.; Vigeant Mar. 28 Tr. 52: 15-2 5; 51:1-2.
[7] Hoffman Decl. ¶ 6.
[8] *Id*.; Vigeant Mar. 28 Tr. 52:1-25.
[9] *Id*. ¶ 7.

3

**B.     The Carrier Sales Employee Positions Are Entrepreneurial And Diverse**

Plaintiff asserts misclassification claims for all Illinois employees holding every job title she ever held on the carrier side of NAST (and a few she did not). Plaintiff worked for only one of the eight or teams and over a dozen GMs supervising the ninety-six members of the putative class.[10] The record is undisputed that each GM supervised a "team" or "pod" of CSEs and had wide discretion to manage their work and to apply C.H. Robinson's policies and standards, as each saw fit.[11] Teams included varying numbers of individuals and job titles, and not all teams included a Carrier Representative, CAM, or SCAM.[12]

Within the CSE job family, CAMs and SCAMs are heavily commissioned and incentivized with a guaranteed draw or salary.[13] The specific job duties of the CSEs vary across job titles and even within job titles.[14] Although Plaintiff supports her Motion with cookie-cutter, conclusory declarations from the Opt-in Plaintiffs, the depositions of the GMs and declarations of non-class member CSEs[15] who worked alongside the putative class highlight the variability of the CSE positions and demonstrate why proceeding on representative proof is untenable.

CSEs are CHRW's principal representatives to the carriers used to provide logistic services to its customers.[16] A CSE of any job title is an entrepreneurial professional who exercises discretion and independent judgment and relies on his or her unique expertise of the market to develop a strategic portfolio of carriers to support the customer side of NAST and advise Customer Representatives regarding a customer's freight needs.[17] Some CSEs focus on

---

[10] ECF No. 7, Ex. N.
[11] Dietrich Tr. 100:22-101:17.
[12] Vigeant Mar. 28 Tr. 39:1-25.
[13] Hoffman Decl. ¶ 8.
[14] *Id*. ¶ 9.
[15] Declaration testimony is limited to Illinois CSE's who have arbitration agreements with CHRW.
[16] Hoffman Decl. ¶ 7; Vigeant Tr. 52:10-11.
[17] *Id*. ¶ 9; Vigeant Mar. 28 Tr. 51:18-20.

4

*building relationships* with the customer side of CHRW's business to better understand customer supply chain trends to inform the carrier side of CHRW's business.[18] Other CSEs promote sales by *leveraging their research and expertise* to understand trends associated with the carrier market to advise the customer side of CHRW's business on how to eliminate customer supply chain inefficiencies.[19] Some CSEs focus on *growing existing relationships* with carriers, in contrast to others who focus on adding new carriers to their portfolio.[20] CSEs must possess strong communications skills and the ability to "think on their feet" and "achieve individually."[21]

There is no standard, or centrally proscribed method for how a CSE grows or pursues a relationship with a carrier. Some may focus on opportunities to increase a carrier's equipment utilization; others may advise carriers on ways to reduce empty miles; others may communicate customer market conditions; and still others may advise on how to reposition a carrier's equipment.[22] Relatedly, some CSEs may perform business research to analyze trends in the customer or carrier market. How and the extent to which a CSE does so varies widely and is within each CSE's discretion and judgment. For example, some CSEs communicate with customer representatives, others rely on CHRW's institutional information regarding carriers, rates, and lanes, while others may perform independent research.[23]

Nor is there a rule for the composition of a carrier portfolio. CSEs have discretion to choose how many carriers to develop and the type to target. CSEs also can decide which type of

---

[18] James Ormond Decl. ¶ 6.

[19] *Id.*; Andrew Black Decl. ¶ 10; Herchenroether Tr. 97:16-19; 102: 3-13; 116: 10-13.

[20] Ronnit Yari Johnson Decl. ¶ 6 (70% time developing existing relationships); Herchenroether Tr. at 257: 8-20; Ormond Decl. ¶ 19 (20% time prospecting); Christine Ryndak Decl. ¶ 18 ("half my time . . . prospecting"); Johnson Decl. ¶ 6 (10% time prospecting); Anthony Arreguin Decl. ¶ 20 ("30 minutes per week" prospecting); Theil Decl. ¶ 7 ("30% of my cultivating relationships with existing carriers").)

[21] O'Sullivan Tr. 10-16.

[22] Black Decl. ¶¶ 9, 17; Arreguin Decl. ¶ 8; Ormond Decl. ¶ 20.

[23] Dietrich Tr. 144: 14-18; 146:11-14; Ormond Decl. ¶ 15; Black Decl. ¶ 16; Arreguin Decl. ¶ 14; Johnson Decl. ¶ 15; Thiel Decl. ¶ 16; Corrigan Decl. ¶ 13.

5

loads to cover and which carriers to cover them. For example, CSEs can focus on "lane-specific"
loads, *i.e.*, loads that simply travel from point to point, regardless of time.[24] As Plaintiff
conceded, "everyone had a different structure of how they built their portfolio."[25] CSEs exercise
varying levels of discretion as they "become more accomplished" and more "dynamic" in
strategically targeting different types of carriers, based on, for instance, whether a carrier is
"local," "long haul," "HAZMAT" or geographically focused.[26] Thus, each CSE is different to the
extent he or she created a diversified portfolio; some working with as few as two carriers and
others working with as many as hundreds of carriers.[27]

Duties vary among CSEs depending on the number and type of carriers, and level of
automation of the carriers, in their portfolio.[28] For example, the number of carriers in a CSE's
portfolio impacts job duties because legacy carrier accounts require much different service than
new or multiple accounts to be grown by the CSE.[29] Likewise, CSEs that utilize carriers with
automated EDI and GPS, which provide real time tracking updates, spend less time "tracking and
tracing" the customer's freight. CSEs who utilize carriers without these automated services
spend more time proactively tracking and tracing, communicating with the carrier on the status,
and reporting the same to the Customer Representative.[30] Still other CSEs may rely on junior
members of their team to perform these duties.[31]

---

[24] Ryndak Decl. ¶ 5; Simon Tr. 34:6-9.
[25] Dietrich Tr. 146: 5-6.
[26] O'Sullivan Tr. 45: 4-22; Black Decl. ¶ 6 Ryndak Decl. ¶ 7; Arreguin Decl. ¶ 8; Ormond Decl. ¶ 7;
Johnson Decl. ¶ 8; Corrigan Decl. ¶ 12.
[27] Herchenroether Tr. at 257: 8-20; Vigeant Tr. 55:12-18; O'Sullivan Tr. 45: 4-13; Black Decl. ¶ 6-7;
Ryndak Decl. ¶ 7; Arreguin Decl. ¶ 21; Ormond Decl. ¶ 23; Johnson Decl. ¶ 20; Thiel ¶ 23.)
[28] Hoffman Decl. ¶ 10; Herchenroether Tr. 104-105; Ormond Decl. ¶ 20; Ryndak Decl. ¶ 15.
[29] Hoffman Decl. ¶ 10.
[30] O'Sullivan Tr. 30:3-25; 31:1- 25; 33: 1-11; Ryndak Decl. ¶ 15 ("Because most of my carriers . . . are
not automated . . . I spend significant time . . . proactively tracking. . . ."); Johnson Decl. ¶ 17 ("Because
about half of the carriers that I utilize . . . use EDI and GPS, I spend 30% of my day tracking and tracing
a load."); Thiel Decl. ¶ 18.
[31] Ormond Decl. ¶ 16; Ryndak Decl. ¶ 15; Thiel Decl. ¶ 24.

The varying levels of discretion and independent judgment are underscored by the fact that some CSEs had assistants or interns, or both, while others did not, and volume as opposed to revenue was a factor for deciding whether an assistant was needed.[32] Job duties also vary to the extent CSEs are provided assistants to support their portfolio.[33] For example, two CSEs could generate the same amount revenue, but nevertheless develop and manage very different volumes, thereby impacting how a CSE focuses her/his work time. More volume means more carriers to cultivate, more loads to manage, and more claims or issues to resolve.[34] As one CSE, explained, "[b]ecause I have a team that supports me, I can focus on business development, including travel and meeting with carriers and customers."[35] Consequently, SCAMs spend varying amounts of time mentoring or training Carrier Representatives, as opposed to performing other job functions, and whether mentoring is a "primary" duty depends on the particular SCAM.[36] How SCAMs mentor Carrier Representatives differs from SCAM to SCAM, depending on their "styles."[37]

The job functions of CSEs also vary depending on the extent to which CSEs represent CHRW in resolving customer service issues and event management (*i.e.* trouble shooting). Plaintiff admitted the amount of troubleshooting varied, based on the number of loads that were being overseen.[38] Through discussions with the customer side, CSEs may determine in their discretion at the outset if a load is "critical," meaning it should be proactively tracked.[39] Similarly, CSEs exercise discretion in performing "event management," which is addressing

---

[32] Herchenroether Tr. 276:11-20; Black Decl. ¶ 19 Ormond Decl. ¶ 16, 21.
[33] Ormond Decl. ¶ 16; Black Decl. ¶ 19.
[34] Herchenroether Tr. 277:18-25.
[35] Ormond Decl. ¶ 23.
[36] Vigeant Mar. 28 Tr. 90:19-24; 91:13-19; 93:7-11; Ormond Decl. ¶ 21 (5-10 hours per week); Black Decl. ¶ 18 (2 hours per week); Johnson Decl. ¶ 21 ("substantial part of my day".)
[37] Herchenroether Tr. 116: 7-9.
[38] Dietrich Tr. 131; Ormond Decl. ¶ 17.
[39] O'Sullivan Tr. 32-33.

issues like late pick-ups, late deliveries, and breakdowns.[40] Depending on a CSE's judgment, closing out an "event" may require communication with the carrier, the customer, or escalating an issue to internal CHRW teams.[41] As Plaintiff admitted, she was "trying to balance interests and come to a resolution that worked for everybody" and "where the customer relationship would not be tarnished and [her] relationship with the carrier would not be tarnished, where both parties would not be upset with outcome . . . ."[42]

Relying on their experience, industry knowledge, and negotiation skills, CSEs negotiate the lowest possible rates with carriers to increase margins earned by the Customer Representatives.[43] As Plaintiff admitted, her responsibilities included "negotiating rates."[44] Sometimes, CHRW sets a suggested target price, called a "max buy," but CSEs have discretion to accept different rates that would produce less profits, or even a loss on shipment depending upon the circumstances and their discussion with the Customer Representatives.[45] Ultimately, CSEs may (1) accept a carrier's counteroffer; (2) make a counteroffer to the carrier; (3) pass on that particular carrier and continue to search for a carrier; (4) contact the customer to discuss rates; (5) change the recommended cost of the load; or (6) cancel a load that has been booked.[46]

The difference between the CSE positions is not, as Plaintiff argues, just quantitative or based "primarily the volume and revenue of freight the employees generate." (ECF No. 147.) CHRW clarified in its corporate deposition that becoming a SCAM versus a CAM is not

---

[40] O'Sullivan Tr. 40: 7-25; Ryndak Decl. ¶¶ 16-17 ("In certain circumstances . . . I escalate the issue to my [SCAM] or General Manager."); Arreguin Decl. ¶¶ 16-17; Ormond Decl. ¶ 16-18 ("I will contact the carrier and suggest a resolution. I do not need approval to make these decisions."); Thiel Decl. ¶¶ 19-21.
[41] O'Sullivan Tr. 40:21-25; 41:1-3; Dietrich Tr. 129-130.
[42] Dietrich Tr. 141:21-25; 141: 1-7.
[43] Herchenroether Tr. 131:16-19; Black Decl. ¶¶ 11, 12, 14; Ryndak Decl. ¶¶ 9-10; Arreguin Decl. ¶¶ 9-13, 15; Ormond Decl. ¶ 9-11; Johnson Decl. ¶¶ 9-11; Thiel Decl. ¶¶ 10-11, 13.
[44] Dietrich Tr. 143:8-13.
[45] Vigeant Mar. 28 Tr. 55: 12-18; 56: 12-25; 57:1-18; 94: 8-21; Herchenroether Tr. 127-130.
[46] Hoffman Decl. ¶ 11; Herchenroether Tr. 152:3-11; Corrigan Decl. ¶ 10.

primarily based on the revenue an employee generated, but rather, on the *discretion* of the their leader.[47] The reason SCAMs are generally more profitable than CAMs, who in turn are generally more profitable than Carrier Representatives, is *qualitative*. SCAMs generate the most revenue because they have the deepest understanding of the carrier market and the freight needs of the customers and are able to leverage that experience.[48] One GM explained, the difference between a CAM and SCAM is "sophistication."[49] SCAMs generally have stronger relationships with carriers and communicate with carriers more frequently and with more senior contacts at the carrier.[50] Some SCAMs may even develop relationships with Customer Representatives and the customers themselves, and one SCAM spent as much as 35% of his overall time working on the customer side, and 80% of his prospecting was focused on customer opportunities.[51]

### C. Hours Worked By CSEs Are Variable And At The Discretion Of Each General Manager If Not The CSE Herself/Himself

CHRW does not centrally mandate CSE work schedules and does not require its CSEs to work a minimum number of hours. Rather, CSEs "basically set their own schedules with their team leaders," but with the "guidance . . . that during business hours of 7 to 5, we have representation from all the teams."[52] The record evidence shows that Plaintiff hitches her pursuit of class treatment to a fundamental misreading of CHRW Chicago Central Carrier Sales Standards[53] These standards provide that the shift at Chicago Central is 7:00 a.m. - 5:00 p.m.[54] However, the standards are no more than that – standards.  CHRW's written policy is schedules

---

[47] Vigeant Mar. 28 Tr. 83:8-20.
[48] O'Sullivan Tr. 46:7-16.
[49] Roscich Tr. 23:7-10.
[50] O'Sullivan Tr. 46:4-16.
[51] Ormond Decl. ¶¶ 5, 19.
[52] O'Sullivan 73:21-25; Vigeant Tr. 110:10-11.
[53] ECF No. 147 at 6-7.
[54] *Id*.

9

are set at the GM level, and the hours actually worked by CSEs are not a mandated 7:00 am to 5:00 p.m.[55] Rather, the GMs regard the 7:00 a.m. to 5:00 p.m. "shift" as standard business hours, and set their expectations with an overarching objective of ensuring that each GM has sufficient CSE coverage throughout the day, and one member of each team on Saturday mornings.[56]

CHRW also does not track the hours worked by exempt CSEs; nor do its GM's, who do not monitor when their CSEs come and go.[57] The amount of hours worked per workweek vary by CSE based on the composition of her/his portfolio of carriers. CSEs with large fleets could provide more coverage of loads than an employee with a few carriers.[58] In addition, there is no set policy for when an exempt CSE takes a break or lunch. For example, on one team, SCAMs work with the Carrier Representatives to determine the schedules and the timing of breaks to make sure there is appropriate coverage.[59] On another GM's team, the teams and team leaders themselves "worked out their shifts."[60] As one GM said, "[schedules] can vary depending on teams. Their business needs. Their personal things that happen. So there's - there's fluidity within the scheduling."[61] Ultimately, the number of hours worked "varies depending on - on the individual rep."[62] Similarly, the Saturday shift schedule varies by team and across the team.[63]

## D. Data "Proxies" Are Insufficient To Overcome Individual Inquiries

During discovery, CHRW has produced payroll, compensation, and PTO data for the putative class, as well as timekeeping records for CSEs designated as non-exempt. Most recently,

---

[55] *Id.*; Roscich Tr. 37:15-20.
[56] *Id.*
[57] Vigeant Mar. 28 Tr. 112:25; 113:1-8.; Herchenroether Tr. 21-23; 134:24-25; O'Sullivan 72: 23-25; 73: 1-4; Roscich Tr. 25: 2-8.
[58] O'Sullivan Tr. 14-24; 72: 1-4.
[59] Herchenroether Tr. 145:20-25; 146:1-6.
[60] Roscich 37: 17-25.
[61] O'Sullivan Tr. 73:7-10; Roscich Tr. 38: 8-12.
[62] Herchenroether Tr. 132:15-17.
[63] Herchenroether Tr. 134:1-10.

CHRW has produced data from its proprietary operations system, Navisphere, which purports to show when each user, a member of the putative class, booked specific loads of freight, or otherwise had interactions with, or "touches" in, the Navisphere platform. Navisphere, however, is insufficient and incomplete to serve as a reliable proxy for timekeeping because the system does not capture: (i) all possible user interactions or "touches" with Navisphere; (ii) any work performed outside of Navisphere; (iii) meal, rest or other break time; or (iv) whether work was performed before, after or in-between touches.[64] The data is insufficient without individualized evidence to show hours worked due to the extreme variability in the number of discrete hours per day each user had an interaction with Navisphere; often as low as 1 hour per work day with as little as 1 or a handful of touches in the Navisphere system.[65]

Moreover, large gaps of time between Navisphere entries for "booking freight" raise individualized questions disputing Plaintiff's contention that the primary duty of herself and the class was to "book freight."[66] This data does not on its own support Plaintiff's claims, and simply cannot serve as a viable proxy for either time-keeping or proof of primary duty without individual inquiry of the putative class members.

## III. <u>ARGUMENT</u>

### A. **Plaintiff Cannot Satisfy The More Stringent Rule 23 Standard**

Conditional certification of a collective action under the FLSA does not dictate that the more stringent Rule 23 standard for class certification has been satisfied. In granting conditional certification, the Court correctly noted the low threshold under 29 U.S.C. § 216(b), observing that "[w]hile not robust, at this stage of the inquiry, Plaintiff must only make a modest factual

---

[64] Hoffman Decl. ¶¶ 12-15.
[65] *Id.* ¶¶ 16-26.
[66] *Id.* ¶¶ 27-35.

11

showing . . . ." (ECF No. 103 at 3.) By contrast, "[t]he Rule 23 standard for certification is significantly more demanding than the lenient standard for conditional FLSA certification." *Smith v. Family Video Movie Club, Inc.*, 311 F.R.D. 469, 472 (N.D. Ill. 2015); *Nehmelman v. Penn Nat. Gaming, Inc.*, 822 F. Supp. 2d 745, 755 (N.D. Ill. 2011) ("the FLSA's 'similarly-situated requirement has been interpreted as 'considerably less stringent' than that applied to class actions certified under Rule 23.'"); *see also*, *Tamas v. Family Video Movie Club, Inc.*, No. 11 C 1024, 2013 WL 4080649, at *4, 8 (N.D. Ill. Aug. 13, 2013) (granting conditional certification but denying Rule 23 certification because plaintiff "fails to meet the more stringent requirement of predominance under Rule 23"); *Ivery v. RMH Franchise Corp.*, 280 F. Supp. 3d 1121, 1136-37 (N.D. Ill. 2017) (conditional certification does not require establishing adequacy).

Here, Plaintiff cannot meet the significantly higher burden imposed by Rule 23 to warrant class certification. This warrants denial of the Motion.

### B.     Plaintiff Fails To Satisfy The Requirements Of Rule 23(a)

Class certification requires Plaintiff to show that: (1) the class is so numerous that joinder is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). These requirements do "not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, class "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *In Re Bank of Am.*, 286 F.R.D. 572, 578 (D. Kan. 2012). The U.S. Supreme Court has recognized this "rigorous analysis" will frequently involve the merits of the plaintiffs' underlying claims. *Id.* (citing *Gen. Tele. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). As such, the Court should

12

"probe behind the pleadings before coming to rest on the certification question." *Id*. (quotation omitted.)

Plaintiff concedes that whether CHRW violated the IMWL turns on whether CHRW properly classified the putative class members as exempt. (ECF No. 147 at 9-10.) The FLSA exempts from its coverage employees who are "compensated on a salary basis at a rate of not less than $455 per week" and "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.600(a). Under the administrative exemption, employees are exempt if their primary duty includes the: (1) "performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (2) "exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). The IMWL echoes this standard.

Plaintiff has the "burden at the class-certification stage to demonstrate, under Rule 23, that resolving this exemption issue on a class-wide basis is appropriate." *Dailey v. Groupon, Inc.*, No. 11 C 05685, 2014 WL 4379232, at *4 (N.D. Ill. Aug. 27, 2014). As outlined below, given the nature of Plaintiff's claims and the record evidence, Plaintiff cannot meet this burden because the determination of the applicability of the administrative employee exemption "requires a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012).

### 1. Plaintiff Fails To Establish There Are Common Questions Of Law Or Fact

The commonality requirement in Rule 23(a)(2) requires Plaintiff to show that her claims depend upon a common contention or question, and more importantly that the action "is capable of class-wide resolution - which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S.

13

at 350. In *Wal-Mart,* the Supreme Court cautioned that the language setting forth the commonality requirement is "easy to misread, since any competently crafted class complaint literally raises common questions." *Id.* at 2250-51 (reasoning that reciting common questions such as whether there is an unlawful employment practice is not sufficient to obtain class certification). The Supreme Court explained: "[w]hat matters to class certification . . . is not the raising of common 'questions' — even in droves — but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.*

Plaintiff fails to identify common questions, much less "common answers" within the meaning of *Wal-Mart.* Plaintiff's asserted common question – "whether Defendant can prove its carrier sales employees' primary duty fits into an overtime exemption" – is precisely the type of question that *Wal-Mart* found insufficient. (ECF No. 146 at 11.) *See Wal-Mart,* 131 S. Ct. at 2250-51. While framed as a common question, Plaintiff fails to demonstrate that the question "is capable of generating common answers." *Id.* at 2251. Although Plaintiff asserts this question will "be answered with common proof" the "proof" that Plaintiff offers is insufficient.

For example, Plaintiff relies on the fact that the positions at issue have common job descriptions, and that CHRW uniformly classified these positions for exemption purposes. (ECF No. 147 at 9-10.)[67] But common job descriptions and the common classification of employees as

---

[67] Plaintiff argues that she was obliged to file a renewed Motion for Sanctions based on CHRW's alleged "concealment and last minute disclosure of information relating to its December 2016 plans to re-classify all employees in these positions to non-exempt…." (ECF No. 147 at 8.) Specifically, Plaintiff erroneously contended that CHRW had performed jobs analyses in connection with a 2016 project to reclassify all CSE positions. Although CHRW consistently maintained in its discovery responses that the only position it reclassified to non-exempt was the buyer / carrier sales representative position, effective January 1, 2017 (ECF No. 150 at 8), Plaintiff sought additional discovery of "jobs duties" analyses only to confirm Defendant's position that its 2016 exemption project planned for reclassification of the CSEs solely on the basis of the anticipated regulation increasing salary threshold for exemption; that no jobs duties analysis was performed in connection with the project; that the regulation was blocked by a federal judge and the project terminated; and that only the buyer / carrier sales representative position was reclassified effective January 1, 2017, on the basis of salary level. (Vigeant Nov. 5 Tr. 8: 5-6; 10: 18-25; 11;1-3; 11:11-15; 16: 24-25; 17: 1-15; 28: 12-24; 33: 19-25; 34: 1-7; 56: 20-25; 57: 1-20.)

exempt are insufficient bases for class certification. *See e.g., Bunyan v. Spectrum Brands, Inc*., No. 07-CV-0089-MJR, 2008 WL 2959932, at * 7 (S.D. Ill. Jul. 31, 2008) (common job descriptions alone are insufficient to warrant class-wide treatment); *Cruz v. Lawson Software, Inc.,* 764 F. Supp. 2d 1050, 1057 (D. Minn. 2011) ("[t]he existence of these [common] job descriptions does not eliminate the need for the Court to conduct a detailed analysis of actual job duties"); *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1099 (D. Kan. 2012) ("merely classifying a group of employees as exempt does not automatically qualify them as similarly situated, nor eliminate the need to make a factual determination as to whether class members are actually performing similar duties"); *Oetinger v. First Residential Mortg. Network, Inc*., No. CIV. 3:06-CV-381, 2009 WL 2162963, at *4 (W.D. Ky. Jul. 16, 2009) (same).

In *Dailey*, 2014 WL 4379232, at *5, the court rejected a similar argument that commonality was satisfied as result of "uniform training," uniform "job descriptions," and uniform "performance criteria." *Id*. The court concluded that regardless of a uniform exemption policy, "Courts must still engage in a case-by-case analysis of the employee's duties and responsibilities." *Id*. (citing *In Re Wells Fargo Home Mortg. Overtime Pay Litig*., 571 F.3d 953, 957 (9th Cir. 2009)).

Similarly, where the alleged common issue is whether class members were properly classified as exempt, individual factual determinations into each class member's daily activities are necessary, precluding commonality. *Diaz v. Elecs. Boutique of Am., Inc.,* No. 04-CV-0840E(SR), 2005 WL 2654270, at *6 (W.D.N.Y. Oct. 17, 2005); *Romero v. H.B. Automotive Grp., Inc*., No. 11 CIV. 386, 2012 WL 1514810, at *18 (S.D.N.Y. May 1, 2012) (no commonality because whether class members were misclassified "will require individualized examinations of each plaintiffs daily responsibilities"); *see also Till v. Saks, Inc*., No: C-11-

00504 SBA, 2013 WL 5755671, at *6 (N.D. Cal. Sept. 30, 2013) (no commonality in a misclassification case); *Weston v. Emerald City Pizza, LLC,* 137 Wash. App. 164, 171-73 (Wash. App. 2007) (same).

In sum, Plaintiff fails to provide any evidence that her purported common contention is capable of class-wide resolution, and she does not demonstrate how the issue central to this litigation will generate the common answers required by Rule 23(a)(2).

### 2. Plaintiff's Personal Claims Preclude Satisfaction Of The Typicality And Adequacy Requirements

Plaintiff's individual claims are not typical of the claims of the putative class members, and she cannot adequately represent their interests because she asserts four personal Title VII and ADA claims which are not shared by any class member.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Claims are typical if they arise from the same course of conduct and are based on the same legal theory. *Van v. Ford Motor Co*., No. 14-CV-8708, 2019 WL 3976370, at *19 (N.D. Ill. Aug. 22, 2019); *Gen. Tele.*, 457 U.S. 147, 150, 160, n. 2 (1982) (finding a class representative's claim for discrimination in promotion was not typical of class members' claims for discrimination in hiring). The typicality requirement often "merges" with the requirement that the class representative "will fairly and adequately protect the interests of the class." *CE Design Ltd. v. King Architectural Metals, Inc*., 637 F.3d 721, 724 (7th Cir. 2011).

"The adequacy inquiry under Rule 23(a)(4) seeks to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc v. Windsor*, 521 U.S. 591, 625-26 (1997). Plaintiff may not maintain a class action where, as here, her interests conflict with the interests of the persons she seeks to represent. *Hansberry v. Lee*, 311 U.S. 32, 44-45 (1940); *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993).

16

Adequacy of representation is "one of the most significant prerequisites to a determination of class certification" and "embodies a crucial due process requirement and is not a smokescreen." *Helfand v. Cenco, Inc.*, 80 F.R.D. 1, 6-7 (N.D. Ill. 1977). A court must stringently apply this prerequisite to prevent collateral attacks after judgment by class members who claim that their interests were not vigorously and competently protected. *Id*. at 6-7 (citation omitted).

The Seventh Circuit has held that the "presence of even an arguable defense peculiar to the named plaintiff . . . may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." *CE Design Ltd.,* 637 F.3d at 726 (citing *J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc*., 628 F.2d 994, 999 (7th Cir. 1980)). "Where it is predictable that a major focus of the litigation will be an arguable defense unique to the named plaintiff . . . then the name plaintiff is not a proper class representative." *Koos v. First National Bank*, 496 F.2d 1162, 1164 (7th Cir. 1974). Indeed, "[t]he fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *CE Design Ltd*. 637 F.3d at 726.

Here, it is not just "predictable" that Plaintiff's personal discrimination claims will become the "focus" at trial; it is guaranteed. Plaintiff's misclassification claims are an afterthought. Four of the six counts of the Complaint are devoted to Plaintiff's personal employment discrimination claims, which include claims for gender and disability discrimination, constructive discharge, and retaliation under Title VII and the ADA. (ECF No. 42, Counts III-VI.) Plaintiff devotes only 11 paragraphs in the Amended Complaint to the factual allegations underpinning her misclassification claims, compared to the 32 paragraphs she devotes to her discrimination claims. (ECF No. 42 ¶¶ 11-21, 22-54.)

At trial, therefore, the jury will consider substantial evidence related to Plaintiff's gender and disability claims, including testimony related to whether her discharge was based on non-discriminatory reasons and non-pretextual reasons; whether a reasonable accommodation was possible; and whether she was meeting CHRW's legitimate expectations compared to her male peers. The jury, moreover, will make credibility determinations related to these issues and be provided with law that governs these claims. But none of these considerations will relate to the misclassification claims she asserts on behalf of the absent class members. *Mckinnon v. Dollar Thrifty Auto. Grp., Inc.*, No. 12-CV-04457-YGR, 2016 WL 879784, at *7 (N.D. Cal. Mar. 8, 2016) ("Basker's individual case involves additional claims, a different legal theory, and is susceptible to different defenses . . . . rendering her inadequate as a representative . . . ."). Juror confusion is guaranteed, but that is the least of the class's worries.

The bigger issue is that Plaintiff's personal claims threaten the due process rights of the absent class members. This is exactly what Rule 23's adequacy requirement is designed to prevent. *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90 (7th Cir. 1977) (affirming denial of class certification and explaining Rule 23(a)(4) is a strict threshold requirement for class certification because "due process requires that absent class members be adequately represented in order to be bound by the court's judgment."); *Helfand,* 80 F.R.D. at 6-7. Here, if Plaintiff's discrimination claims are unsuccessful, absent class members could collaterally attack a judgment, arguing that the failure of those claims undermined or tainted the jury's consideration of their misclassification claims. Such a challenge also exists if the jury questions the credibility of Plaintiff with respect to any issue related to her discrimination claims.

Similar circumstances precluded class certification in *Van*, 2019 WL 3976370, at *20. There, in its typicality and adequacy analysis, the court considered the potentially negative

impact that certain claims could have on stronger claims. *Id*. at *21 According to the court in *Van*, "[b]y attempting to tie together the claims of . . .Plaintiffs and putative class members. . . using an objective hostile work environment analysis, Plaintiffs undermine the claims of those who were exposed to the most egregious misconduct." *Id*.; *see also Allen v. City of Chicago*, 828 F. Supp. 543, 553-54 (N.D. Ill. 1993) (finding "personalized nature of plaintiffs' grievances raises a serious question as to whether the representative parties could fairly and adequately protect the interests of the class."); *Johnson v. Bond,* 94 F.R.D. 125, 131 (N.D. Ill. 1982) (finding no adequacy where "[s]eparate claims of denial of a promotion can present substantially different facts and plaintiffs' energies may end up being directed toward presenting and defending their individual claims at the expense of the class"). As in these cases, the class members' claims here are undermined by claims they do not share with the named representative.

Plaintiff also lacks the "same financial stake as members of the class" and therefore has "different incentives in terms of how much time, energy, and money she is willing to spend pursuing" the misclassification claims. *In Re Schering Plough Corp. ERISA Litig*., 589 F.3d 585, 597-602 (3d Cir. 2009) (finding no typicality or adequacy). This is an inherent conflict because trial time is finite and every moment spent pursuing her discrimination claims takes time from pursuing the misclassification claims on behalf of the class. *See Randall v. Rolls-Royce Corp*., 637 F.3d 818, 824 (7th Cir. 2011) ("A class representative's conflict of interest is an independent ground for denial of class certification."); *Muro v. Target Corp.*, 580 F.3d 485, 493 (7th Cir. 2009) (no typicality where plaintiffs' claims were different from putative class members' claims such that the plaintiff did not have the incentive to litigate vigorously certain issues).

Plaintiff's decision to litigate her discrimination claims alongside class claims for misclassification does not advance the "efficiency and economy of litigation which is a principal

19

purpose of [Rule 23]." *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974). Worse, that decision jeopardizes a future judgement and leaves it vulnerable to collateral attack. The class members deserve – and due process guarantees them – a representative free of conflicts of interest and whose pursuit of personal grievances does not undermine their claims. Because Plaintiff's personal discrimination claims are not shared by any class member, she cannot satisfy typicality or adequacy under Rules 23(a)(3) and (4).

### C.      Plaintiff Cannot Meet The Predominance Requirements Of Rule 23(b)(3) Because Resolving Her Claims Requires Individualized Analysis

Plaintiff fails to satisfy Rule 23(b)(3), which requires Plaintiff to show that common questions of law or fact predominate over individualized questions. Fed. R. Civ. P. 23(b)(3). "Although related to Rule 23(a)'s commonality requirement, 'the predominance inquiry is far more demanding.'" *Pavone v. Aegis Lending Corp.*, No. 05 C 1529, 2006 WL 2536632, at *4 (N.D. Ill. Aug. 31, 2006) (quoting *Amchem*, 521 U.S. at 623-24)). "[T]he plaintiff must show that common issues not only exist but outweigh the individual questions. The common questions must be central to all claims.'" *Pavone,* 2006 WL 2536632, at *4 (quotation omitted).

Plaintiff must also show that each element of her claim is "capable of proof at trial through evidence that is common to the class rather than individual to its members." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 818 (7th Cir. 2012) (internal quotes omitted). Assuming arguendo that Plaintiff's claim shares a common contention that is capable of class-wide resolution, which they do not, class certification would still be inappropriate because that contention would be overpowered by the highly individualized issues central to the question of whether the administrative exemption applies. *See In Re Bank of Am.*, 286 F.R.D. at 587.

### 1. Individualized Fact Inquiries Are Required To Determine If Each Employee Meets The Administrative Exemption

Resolution of the class claims under the IMWL requires the trier of fact to decide whether the administrative exemption applies. Given the fact intensive nature of this inquiry, courts faced with misclassification claims regularly refuse to decide such cases on a class-wide basis. For example, in a similar misclassification case brought against CHRW, the district court of Minnesota granted CHRW's motion to decertify the conditionally certified collective action. *See Carlson v. C.H. Robinson Worldwide, Inc.*, No. CIV 02-3780 JNE/JJG, 2006 WL 2830015, at *1, *4, *10 (D. Minn. Sept. 26, 2006). In *Carlson*, the court considered whether the administrative exemption applied to positions similar to Carrier Sales positions here. *Id*. There, the court emphasized that the "[i]dentification of administrative work is not a straightforward exercise" and requires a "fact-intensive inquiry." *Id*. Against this backdrop, the court held that because of "substantial differences in the job duties" of the collective action members, "the administrative exemption cannot be adjudicated collectively." *Id*. If the court in *Carlson* could not resolve the applicability of the administrative exemption under the FLSA's more lenient certification standard, then the same result should follow here under Rule 23's more stringent standard. (*Infra* p. 27.)

Additionally, courts in this jurisdiction and others have denied certification of misclassification claims turning on the applicability of the administrative exemption. *See, e.g*., *Dailey,* 2014 WL 4379232, at *9 (finding individualized issues overwhelmed the administrative exemption analysis); *Hundt v. Direct Sat USA, LLC*, 294 F.R.D. 101, 106, 108 (N.D. Ill. 2013), (N.D. Ill. 2013) (decertifying collective action where "variations . . . require individualized determinations"); *Hill v. R+L Carriers*, No. C 09-1907 CW, 2011 WL 830546, at *5 (N.D. Cal.

Mar. 3, 2011) (decertifying because "[t]he requirements of the administrative exemption . . .

evince the necessity of individualized inquiries").[68]

Courts likewise find that individualized issues predominate where the applicability of

other exemptions turn on the "primary duties" of the position. In *Tamas*, 2013 WL 4080649, at

** 9-10, the court rejected the plaintiff's theory; it held that "the crux of the dispute is whether

the 'primary duties' required of the salaried" employees fell within the exemption, "not whether

Family Video had a common policy of denying overtime . . . ." *Id*. at *9. Ultimately, the court

held that "individualized questions of liability predominated over common ones." *Id. See also*

*Sepulveda v. Wal-Mart Stores*, 237 F.R.D. 229, 249 (C.D. Cal. 2006); *Jiminez v. Domino's Pizza,*

*Inc*., 238 F.R.D. 241, 252 (C.D. Cal. 2006). As in these cases, the question of whether the CSEs

fall within the administrative exemption cannot be decided on a class-wide basis. There is no

common evidence to resolve the exemption status for the entire class.

2.     **Individualized Fact Inquiries Are Needed To Determine Employees'**
       **Primary Duties and Whether They Exercised Discretion**

Plaintiff concedes that CSEs perform office or non-manual work. Thus, the question is

whether each CSE performed primary duties directly related to CHRW's business operations and

whether they exercised independent judgment or discretion on matters of significance in their

work. 29 CFR § 541.2(a)(1); 820 ILCS § 105/4a (1) and (2)(E); 29 CFR § 541.2(b). Through its

Regulations, the United States Department of Labor defines the "administrative operations of a

business," and supplies a non-exhaustive list of functions that qualify for the administrative

exemption, including, "advising the management, **planning, negotiating, representing the**

---

[68] *Alakozai v. Chase Inv. Servs. Corp*., No. 11-CV-09178 SJO JCX, 2014 WL 5660697, at *8 (C.D. Cal. Oct. 6, 2014) ("Determining whether CISC misclassified its Advisors as exempt is an 'individualized inquiry involving facts unique to each potential plaintiff.'"); *Spainhower v. U.S. Bank Nat'l Ass'n*, No. 2:08-CV-00137-JHN-PJWx, 2010 WL 1408105, at *4 (C.D. Cal. Mar. 25, 2010) ("where a defendant claims exemptions, like the administrative . . . individualized inquiries . . .  are critical").

**company, purchasing, promoting sales, and business research**, and control." 29 CFR § 541.205(b) (emphasis added).[69] An employee need not perform all of these functions to qualify as exempt. *Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 982-83 (7th Cir. 2011).

### a. Variations In Actual Job Functions Require Individualized Inquiries To Ascertain *Each* Employee's Primary Duties

Plaintiff's Motion ignores the variations in job functions among the CSEs and instead reduces their "core function" to "booking freight." (ECF No. 147 at 11.) This is inaccurate.

The evidence shows significant and substantial variations with respect to the job functions CSEs performed (within and across job titles) that the DOL Regulations classify as "administrative operations of a business," including the degree to which employees: (a) conducted market research; (b) determined what carrier types to utilize or target; (c) independently negotiated with carriers on contract terms, or relied on input from General Managers or Customer Representatives; (d) represented CHRW in resolving customer service issues (event management); (e) trained or mentored other employees; (f) advised carriers regarding efficiencies and trends; (g) grew and/or maintained relationships with carriers (including planners or executives) for the benefit of the CHRW; and (h) provided support Customer Representatives or CHRW's customers themselves. There is also substantial variation in the manner in which employees negotiated carrier prices, including the extent to which they agreed to prices below the "max buy." (*Supra* p. 9.)

The performance of these job functions falls within the categories of planning, negotiating, representing the company, purchasing, promoting sales, and business research – all

---

[69] The IMWL applies the pre-2004 DOL Regulations in defining the administrative exemption. *See* 820 ILCS § 105/4a(2)(E). All references herein are to the pre-2004 Regulations. Regardless, the 2004 Regulations did not substantially alter the administrative exemption test. *Roe-Midgett v. CC Servs., Inc.,* , 512 F.3d 865, 870 (7th Cir. 2008).

functions that qualify for the administrative exemption. *See* 29 CFR § 541.205(b); *Koehler v. Freightquote.com, Inc*., No. 12-CV-2505-DDC-GLR, 2015 WL 4203962, at *24 (D. Kan. July 10, 2015) (finding Truckload Coverage employees' development of relationships with carriers outside of making contracts to ship their goods, to be administrative activities).

Lumping these job functions under "booking freight" ignores reality. Contrary to Plaintiff's belief, the determination of an employee's "primary duty must be based on all the facts in a particular case" – not simply those facts which Plaintiff wishes to discuss or characterize. 29 CFR § 541.206(b); 29 CFR § 541.103. Plaintiff is likewise incorrect that the only "difference between the three positions is the "volume and revenue of freight the employees generate." (ECF No. 147 at 4.) This characterization ignores the qualitative differences between each position, particularly how, as Carrier Representatives transition to a SCAM, they acquire market expertise which allows them to increasingly represent CHRW and develop relationships with higher level contacts at the carrier. (*Supra* pp. 7-10); *see Schaefer-LaRose*, 679 F.3d at 575 (holding that sales representatives perform administrative tasks because they "are the principal ongoing representatives of the company to the professional community").

Plaintiff's blanket characterization that the entire class's primary duty is booking freight cannot be reconciled with her own experience at CHRW. Although Plaintiff maintains that her "primary job duty" was the purportedly non-exempt function of booking freight, Navisphere data produced in discovery records that some days she had only one or two bookings – begging the question what duties did she perform the remainder of the day?[70] While not the sole test, the time spent on exempt work is useful in determining primary duty. *Id*. Where employees spend more than 50 percent of their time performing exempt work, the Regulations indicate that it satisfies

---

[70] Hoffman Decl. ¶¶ 27-35. Similar gaps in data for freight bookings also are shown for putative class members. *Id*.

the primary duty requirement. *Id. Hundt*, 294 F.R.D. at 105 ("'an employee's performance of nonexempt work does not preclude the exemption . . . .'").

Dietrich's data demonstrates that the determination of how much time CSEs spend performing exempt activities versus alleged non-exempt activities is not amenable to being determined on a class-wide basis given the varying degrees to which the employees at issue perform the above-described job functions. *Hundt*, 294 F.R.D. at 107 (decertifying because "determination about each plaintiff's primary duty must be undertaken individually").

Ultimately, variations among the CSEs and within each position as to the performance of the these functions demonstrate that individualized assessments are necessary to determine whether each employee's primary duty is directly related to CHRW's business operations.

### b. Substantial Variations Exist Regarding The Extent To Which Employees Exercised Independent Judgment Or Discretion

The administrative exemption also requires that CSEs exercise independent judgment or discretion on matters of significance in their work at CHRW. 29 CFR § 541.2(b). Plaintiff cannot demonstrate, as she must, that this issue can be decided on a class-wide basis because the record demonstrates that the level of independent judgment or discretion afforded to and exercised by CSEs varies dramatically, requiring individualized assessments of fact.

Indeed, the record shows that no two CSE's experiences at CHRW's were or are identical. Instead, the level of independent judgment and discretion exercised by CSEs in the performance of their jobs varies materially and is affected by such factors as the business needs, manager supervision, and an individual's work ethic and approach to the job. Indeed, the record establishes wide variance with respect to the discretion exercised by CSEs in connection with (1) prospecting and adding new carriers to their portfolio; (2) event management and addressing problems; (3) servicing existing carriers in their portfolio; (4) growing business from existing

25

carriers in their portfolio; (5) the negotiation of pricing; (6) selecting carrier types to prospect or target; (7) suggesting strategies for carriers to improve their quality; (8) the manner and extent to which a CAM or SCAM mentored Carrier Representatives. (*Supra* at pp 5-10.)

Because each CSE exercises varying degrees of discretion and independent judgment in the performance of their jobs, the Court cannot use one employee to extrapolate the discretion and independent judgment exercised by any others. Rather, the varying degrees of discretion and independent judgment requires the Court to perform a thorough, fact intensive analysis of the individual employee's actual performance of his duties and responsibilities. *Schaefer-LaRose*, 679 F.3d at 572. Therefore, class-wide treatment of these issues is inappropriate.

### 3. Plaintiff Cites No Authority To Show That Common Questions Predominate

Rather than address these job variations, Plaintiff simply claims that CHRW's administrative exemption defense "is outcome determinative and is a precursor for liability for each class member." (ECF No. 147 at 15.) As such, Plaintiff theorizes that "it predominates over any individual questions." (*Id.*) The problems here are twofold. First, courts have rejected similar arguments. *See Strait v. Belcan Eng'g Grp., Inc.*, 911 F. Supp. 2d 709, 734 (N.D. Ill. 2012) ("Plaintiffs rely again on the misguided argument that common issues predominate because the exempt employees' claims rise or fall as a class."). Second, Plaintiff's statement cannot be reconciled with the overwhelming number of courts that have refused to certify misclassification cases because individualized issues predominated the applicability of the administrative exemption. (*Supra* pp. 21-23.) Plaintiff fails to address, much less distinguish this authority.

Instead, relying on *Messner, 669* F.3d at 815, Plaintiff argues that common questions predominate because "undergirding the claims of the named plaintiffs and those of the class is a 'common nuclease of operative facts and issues.'" (ECF No. 147 at 14.) *Messner*, however, is

distinguishable as an antitrust case – not a misclassification case that turns on the applicability of the administrative exemption. Moreover, in *Messner*, "[t]he ability to use . . . common evidence . . . to prove a class's claims [was] sufficient to support a finding of predominance . . . under Rule 23(b)(3)." 669 F.3d at 819. As already discussed, the opposite is true in this case due to individualized questions surrounding the applicability of the administrative exemption.

A larger more serious flaw in Plaintiff's argument is her reliance on *Hudgins v. Total Quality Logistics, LLC,* No. 16 C 7331, 2019 WL 354958, at *2 (N.D. Ill. 2019). (ECF No. 147 at 12.) *Hudgins* is distinguishable because it involved certification of a collective action – not certification of a Rule 23 class, which is subject to a more stringent standard. *See O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 584 (6th Cir. 2009), *abrogated by Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016) ("While Congress could have imported the more stringent criteria for class certification under Fed. R. Civ. P. 23, it has not done so in the FLSA."); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1106 (11th Cir. 1996) (same); *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 481 (E.D.N.Y. 2001) (same)(collecting cases).[71]

Confronted only with a FLSA collective action, the court in *Hudgins* applied a traditional "similarly situated" analysis, focusing on whether there was "'an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of overtime laws.'" *Hudgins*,

---

[71] Although in *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013), Judge Posner noted that the two standards have somewhat "merged" and there "isn't a good reason to have different standards for the two types of actions," subsequently courts have recognized this statement as mere "dicta." *Laughlin v. Jim Fischer, Inc.*, No. 16-C-1342, 2018 WL 2538356, at *8 (E.D. Wis. June 4, 2018). In addition, the *Espenscheid* decision has been criticized and distinguished as limited to the facts of that case. *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1113 (9th Cir. 2018) (criticizing *Espenscheid* and holding that "mimicking the Rule 23 standards in evaluating section 216(b) collective actions is not appropriate"); *Johnson v. Pinstripes, Inc.*, No. 12 C 1018, 2013 WL 5408657, at *7, n. 4 (N.D. Ill. Sept. 26, 2013) (explaining the *Espenscheid* holding is limited to the facts of that case) (emphasis added); *Williams v. Angie's List, Inc.*, 223 F. Supp. 3d 779, 782 (S.D. Ind. 2016) (same).

2019 WL 354958, at *3. But a finding that this criteria has been met does not support a finding that Rule 23, and particularly predominance, has been satisfied. In fact, the court in *Hudgins* acknowledged the "differences among members" of the collective action and that "proofs of those theories are inevitably individualized and distinct,'" but still concluded that plaintiffs were similarly situated '"because their claims were unified by common theories of defendants' statutory violations.'" *Id.*, *4. Had *Hudgins* been analyzed under Rule 23, those "individualized and distinct" "proofs" would have precluded class treatment. *See Clark v. Experian Info. Sols., Inc.*, 256 F. App'x 818, 822 (7th Cir. 2007) (finding "class issues did not predominate" where there was the "need for individualized proof"); *Jamison v. First Credit Servs., Inc.*, No. 12 C 4415, 2013 WL 3872171, at *7 (N.D. Ill. July 29, 2013) (same); *Davidson v. Citizens Gas & Coke Util.*, 238 F.R.D. 225, 233 (S.D. Ind. 2006) (same). Accordingly, *Hudgins* is no help to Plaintiff in demonstrating that she has satisfied Rule 23 and, in fact, supports the contrary conclusion.

> **4.    Assessing Whether Class Members Performed "Sales Work" Requires An Individualized Analysis**

Plaintiff argues that "sales work" does not fall under the administrative exemption and, according to Plaintiff, class certification is proper because the question of whether CSEs all perform "sales work" can be answered with "common proof."[72] The Court, however, cannot determine on a class-wide basis that each class member's primary duty is "sales work." Plaintiff ignores the complete record; The line between administrative job functions and "sales work" is not clear, requiring an assessment of each class member's job duties *DeWalt v. Greencroft Goshen, Inc.*, 902 F. Supp. 2d 1127, 1134 (N.D. Ind. 2012).

---

[72] ECF No. 147 at 11.

Seventh Circuit case law authority makes this clear. In *Schaefer-LaRose*, the Seventh Circuit considered whether pharmaceutical "sales representatives" met the administrative exemption test despite the sales-like work they performed and stressed that its assessment required a "fact intensive analysis of the employee's employment duties and responsibilities." *Id*. *Schaefer-LaRose*, 679 F.3d at 572. The Seventh Circuit considered factors such as whether employees actually engaged in selling, concluding that they did not because they acted as an intermediary between patient and physician. *Id.* at 562-63. The Seventh Circuit also analyzed the extent to which the pharmaceutical sales representatives were the "principal ongoing representatives of the company" or main "conduit" to the prescribing physicians. *Id*.

Here, the Court must perform the same fact-specific analysis because there are similarities between the sales representatives in *Shaefer-LaRose* and the CSEs. For example, because CHRW does sell freight, the Court will have to determine the extent each CSE was actually selling, as opposed to acting as an intermediary between CHRW's customers and the carrier. *See id*. at 562-63. Likewise, because CSEs interacted with carriers differently, the Court must assess the extent to which *each* CSE acted as the "principal ongoing representatives of the company" or main "conduit" to carriers. As in *Shaefer-LaRose*, the Court should refuse to categorically conclude that every CSEs' primary duty was "sales work."

The DOL regulations reinforce that such a sweeping conclusion would be wrong. The DOL explained that they were revised to address the concern that they "could be interpreted as denying the administrative exemption to any employee engaged in **any sales**, advertising, marketing or promotional activities." *See* 69 FR 22122-01 at 22140 (emphasis added). The DOL confirmed that "no such categorical change was intended, or is supported by current case law . . .

29

." *Id.* Thus, determining the applicability of the administrative exemption cannot be made mechanically and categorically to the class as a whole merely by labeling duties as "sales work."

Ultimately, the record here reveals some of the primary duties performed by the CSEs are of the type that the Seventh Circuit and the DOL recognize as related to an employer's general business operations. *See Dailey*, 2014 WL 4379232, at *5 (rejecting contention that all class members "perform the same primary duties, all of which can be described as 'sales work'"). Indeed, "sales work" that involves advising carriers and developing long-term customer relationships, is exempt, administrative work. *DeWalt*, 902 F. Supp. 2d at 1135-36. Therefore it is simply impossible to draw a sweeping conclusion that no CSE's "primary duties consist of 'work directly related to management policies or general business operations of the employer or the employer's customers.'" *Roe-Midgett*, 512 F.3d at 871.[73]

### D. Damages And Liability Cannot Be Determined On A Class-Wide Basis

Plaintiff fails to address binding authority requiring a representative means of determining damages on a class-wide basis, including specifically *Espenscheid*. In *Espenscheid*, the Seventh Circuit concluded that plaintiffs could not prove damages on a class-wide basis because assessing damages required individualized proof for each class member. *Espenscheid*, 705 F.3d at 773 ("For it's not as if each technician worked from 8 a.m. to 5 p.m. and was forbidden to take a lunch break and so worked a 45-hour week . . . but was paid no overtime. Then each technician's damages could be computed effortlessly, mechanically, from the number

---

[73] Relying on the "production/administrative dichotomy," Plaintiff argues that class members' primary duty, "booking freight," constitutes "production" work for CHRW. (ECF No. 147 at 11.) This dichotomy is far from determinative and is "neither a clear nor widely relied upon legal test." *Marting v. Crawford & Co.*, No. 00 C 7132, 2006 WL 681060, at *6 (N.D. Ill. Mar. 14, 2006). The "typical example" of the dichotomy is "a factory setting where the 'production' employees work on … running machines, while the administrative employees work in an office communicating with the customers . . . ." *Shaw v. Prentice Hall Computer Pub., Inc.,* 151 F.3d 640, 644 (7th Cir. 1998). The analogy "has an industrial age genesis" which limits its utility in the "modern service-industry context." *Roe-Midgett*, 512 F.3d at 872.

of days he worked each week and his hourly wage . . . . Nothing like that is possible here."); *Farmer v. DirectSat USA, LLC*, No. 08 CV 3962, 2013 WL 2457956, at \*7 (N.D. Ill. June 6, 2013) (decertifying IMWL class claims because plaintiffs failed to provide methodology for class-wide damages); *Dailey,* 2014 WL 4379232, at \*9 (because there is no company-wide policy on work hours or records of hours worked, employees would have to recreate from memory the hours they worked or estimate their overtime in ways unique to each Account Rep).

Nor does Plaintiff explain how damages could be measured in this case on a class-wide basis using a "common methodology," as required by the U.S. Supreme Court in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). *Comcast* held that the plaintiffs' failure to provide a class-wide method or model for establishing damages meant that individual damages calculations would "inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34.

Here, Plaintiff claims that "class members typically worked uniform 50 hour shifts." (ECF No. 147 at 15.) But she conflates hours of operation with actual hours worked. Simply because the Chicago Central office was open from 7:00 a.m. to 5:00 p.m. does not mean CSEs worked that entire time. Plaintiff's supporting declarations make no mention of lunch break or any other breaks. (ECF No. 147-1,14,15,16.) Like in *Espenscheid*, "it's not as if each [Plaintiff] worked from 8:00 a.m. to 5:00 p.m. and was forbidden to take a lunch break and so worked a 45-hour week . . . ." 705 F.3d at 773. There was also no company policy dictating that CSEs start work at, or stay until, a particular time. (*Supra* p. 11.) Nor was there a company practice requiring them to work a set number of hours in excess of the 40 hour work week. (*Id.*) Rather, like Plaintiffs in *Espenscheid*, CSEs had discretion as to how late they would work. (*Id.*)

Because CSEs and their respective GMs took varying approaches to hours worked, assessing damages here (if any) will require individualized determinations resulting in over 96

31

mini-evidentiary hearings – one for each putative class member. *See Franks v. MKM Oil, Inc.*, No. 10 CV 00013, 2012 WL 3903782, at *6 (N.D. Ill. Sept. 7, 2012) (finding no predominance in IMWL misclassification case "because the Court would have to conduct an analysis of . . . how long they worked for [the employer], and make individual calculations"). To calculate damages here, the hours worked "would need to be reconstructed from 'memory, inferred from the particulars of the jobs the technicians did, or estimated in other ways' which were unique to the individual technician." *Farmer*, 2013 WL 2457956, at *7 (citation omitted). Such a process requires individualized inquires that would overwhelm any common issues.

Plaintiff also mistakenly relies on *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 444 (7th Cir. 2015), and *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 379 (7th Cir. 2015). Neither decision addresses *Espenscheid*, much less overrules it; these cases stand for the uncontroversial proposition that individualized damages alone do not defeat class certification. In sum, until Plaintiff offers a common methodology, or for that matter, a solution, to the damages problem, this issue defeats certification.[74]

### E. The Class Action Method Is Not Superior Under Rule 23(b)(3)

Plaintiff incorrectly claims that, based on the factors in Rule 23(b)(3)(A)-(D), the class method is superior to other methods of adjudication. (ECF No. 147 at 16.). As this Court has observed, maintaining a class action alongside Plaintiff's discrimination claims and a 9-person FLSA collective action is the epitome of the "tail wagging the dog." (ECF No. 147 at 17.)

---

[74] Recognizing there is no methodology for damages, Plaintiff makes a one-sentence, throw-away argument on the last page of her brief that issue certification is appropriate on the question whether the administrative exemption applies. (ECF No. 147 at 20.) Plaintiff, however, has failed to satisfy Rule 23(a) and "Rule 23(c)(4) does not exempt class representatives from the threshold requirements of Rule 23(a)." *In Re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *49 (N.D. Ill. Mar. 31, 2017).

### 1. Class Members Have An Interest To Individually Control The Litigation

The interest of the class members in individually controlling their own separate action is a factor in considering whether the class action method is superior to other methods. Fed. R. Civ. P. 23(b)(3)(A). While, Plaintiff simply declares there is no such interest, the putative class members' high salaries refutes that declaration. *See Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365, 373 (N.D. Ill. 1998) (superior method not met where it was "unlikely that many class members will have de minimis claims"). Indeed, the class members were highly compensated, Plaintiff, herself, earning over $100,000 a year and as much as $185,832.38 a year. (Vigeant Tr. 166-168.) (citation omitted). Here, the class action method will not serve the "policy at the very core of the class action mechanism" which Plaintiff acknowledges "was designed for situations . . . in which the potential recovery is too slight to support individual suits." (ECF No. 147 at 18); *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997).

### 2. Plaintiff Offers No Trial Plan That Addresses Manageability Problems

The "difficulties likely to be encountered in the management of" this case as a class action render the class action method impracticable. Fed. R. Civ. P. 23(b)(3)(A). Resolving the class misclassification claims together is problem enough. But litigating those claims alongside Plaintiff's personal claims compounds matters, creating a host of problems: conflicts of interest, due process concerns, juror confusion, and the very inefficiencies Rule 23 is designed to avoid. (*Supra* pp. 18-20.) Plaintiff addresses none of these problems, much less provides a solution or a trial plan that resolves them. *See Espenscheid v. DirectSat USA, LLC*, No. 09-CV-625-BBC, 2011 WL 2009967, at *7 (W.D. Wis. May 23, 2011), *aff'd*, 705 F.3d 770 (7th Cir. 2013) ("plaintiffs have not proposed a trial plan that would lead to a fair result"); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 454 (D.N.J. 1998) (denying certification because of no "suitable and

33

realistic plan for trial of the class claims"); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir.) (affirming district court's conclusion "that there was no manageable trial plan adequate to deal with individualized issues"). Thus, litigating in this "single forum" will not "create consistency" as Plaintiff claims it will create chaos. (ECF No. 147 at 16).

### 3. Resolving The FLSA Collective Action Claims And The Rule 23 Claims Simultaneously Undercuts The Rule 23(b)(3) Superiority Factors

The Court is justified in its concern about the implications of adjudicating combined collective and class actions under the FLSA and IMWL. (ECF No. 147 at 17 (citing ECF No. 139 at 6).) In this case, the tension between the opt-in and opt-out features of the FLSA and Rule 23 undermine a finding that the class action method is superior. Although Plaintiff cites *Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971 (7th Cir. 2011) for the proposition that the Court cannot consider this factor in analyzing superiority under Rule 23(b)(3), *Ervin* does not foreclose the possibility that litigating a "combined" case could undercut the superiority of the class action method. *See id.* at 979 ("there is little in the record that throws light on whether there is anything about this particular case that would stand in the way of the combined actions . . .").

Here, the class action method is not superior because the tension between the opt-in and opt-out nature of the two actions is exacerbated by Plaintiff's pursuit of personal discrimination claims that jeopardize the absent class members' misclassification claims. (*Supra* pp. 17-20.) Only the nine Opt-in plaintiffs who chose to join this litigation have accepted that risk. That risk should not be thrust upon absent class members, who chose not to opt-in to the collective action, but who would have to affirmatively opt-out of the class to avoid accepting that risk. *See De La Riva v. Houlihan Smith & Co.*, 848 F. Supp. 2d 887, 894 (N.D. Ill. 2012) ("The court recognizes that handling the FLSA and IMWL claims in a single proceeding would yield some efficiencies. But those efficiencies are far outweighed by the considerations . . . .").

34

Moreover, in *Warner v. Little John Transportation Servs., Inc.*, No. 5:19-CV-05042, 2019 WL 3331797, at *1 (W.D. Ark. July 24, 2019), the court held that plaintiff, a freight agent, could not demonstrate that the class method was superior, after it previously granted conditional certification under the FLSA. The court held that receiving a second notice of a class action that requires no opting-in, would confuse those who opted-in and those considering it. *Id*.

The superiority requirement is also not met because the Court has compelling grounds to decline supplemental jurisdiction over the IMWL class claims. Under Section 1367(c), a district court may decline supplement jurisdiction if, among other things, "the claim substantially predominates over . . . claims over which the district court has original jurisdiction," or if "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c); *Ervin*, 632 F.3d at 980. Here, the class IMWL claim "substantially predominates" over the FLSA claim because the 96-member Rule 23 class dwarfs the 9-member FLSA collective action by a ratio of 10:1. 28 U.S.C. § 1367(c). This is the same ratio in *De Asencio v. Tyson Foods, Inc*., where the Third Circuit held that the "federal action [was] an appendage to the more comprehensive state action." 342 F.3d 301, 312 (3d Cir. 2003) (4,100 class members: 447 collective action members). Finally, because a single proceeding creates conflicts of interest, due process concerns, juror confusion, and inefficiencies, the Court should find "exceptional circumstances" in which "compelling reasons" exist to decline jurisdiction. 28 U.S.C. § 1367(c). In sum, it is not "sensible to litigate all theories in a single federal proceeding." *See Ervin*, 632 F.3d at 981.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that the Court deny Plaintiff's Renewed Motion For Class Certification in its entirety.

35

**DATED:  November 12, 2019**

Respectfully submitted,

C.H. ROBINSON WORLDWIDE, INC.

By: _____*s/ Gerald L. Maatman, Jr.*_____

Gerald L. Maatman, Jr., IL No. 6181016
(gmaatman@seyfarth.com)
Christina M. Janice, IL No. 6326099
(cjanice@seyfarth.com)
SEYFARTH SHAW LLP
233 South Wacker
Chicago, IL  60606
Phone: 312-460-5000
Fax:    312-460-7000

Gerald L. Maatman, Jr.

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2019, a true and correct copy of the foregoing document was filed electronically through the Court's CM/ECF system, and therefore, will be transmitted to all counsel of record by operation of the Court's CM/ECF system.

s/ Gerald L. Maatman, Jr.
Gerald L. Maatman, Jr.

37

60181591v.4