**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

TARYN DIETRICH, on behalf of herself and a class of all those similarly situated,

Plaintiff,

v.

C.H. ROBINSON WORLDWIDE, INC.,

Defendant.

Case No. 18-CV-04871

Hon. Ronald A. Guzman

**C.H. ROBINSON'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Gerald L. Maatman, Jr., IL No. 6181016
(gmaatman@seyfarth.com
Michael L. DeMarino, IL No. 6298337
(mdemarino@seyfarth.com)
Andrew D. Welker, IL No. 6311442
(awelker@seyfarth.com)
SEYFARTH SHAW LLP
233 South Wacker
Chicago, IL 60606
Phone: 312-460-5000
Fax: 312-460-7000
*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

ARGUMENT ..... 3

I. SUMMARY JUDGMENT STANDARD ..... 3

II. PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED AS TO COUNTS I AND II BECAUSE THE UNDISPUTED MATERIAL FACTS ESTABLISH THAT PLAINTIFF MEETS THE ADMINISTRATIVE EXEMPTION TEST ..... 4

A. CMs Satisfy The Salary Test Of The Administrative Exemption ..... 4

B. CMs' Primary Duty Was Office Or Non-Manual Work Directly Related To The General Business Operations Of CHRW Or Its Customers ..... 5

1. CMs Provide A Crucial Administrative Service To CHRW's Customers By Advising On Carrier Market Conditions And Securing Appropriate Capacity ..... 10

C. The CM Positions Required The Exercise Of Independent Judgement And Discretion With Respect To Matters Of Significance ..... 14

1. Building A Carrier Portfolio Required Discretion And Independent Judgment ..... 16

2. Selecting A Carrier Required Discretion And Independent Judgment ..... 16

3. Negotiating Carrier Rates Requires Discretion And Independent Judgment ..... 18

4. Troubleshooting Problems Require Discretion And Independent Judgment ..... 20

III. PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED AS TO COUNT I BECAUSE THE UNDISPUTED MATERIAL FACTS SHOW THAT THERE WAS NO WILLFUL VIOLATION OF THE FLSA ..... 23

IV. PLAINTIFF'S GENDER AND DISABILITY DISCRIMINATION CLAIMS IN COUNT III AND COUNT IV FAIL AS A MATTER OF LAW ..... 24

A. Dietrich Was Not Meeting CHRW's Legitimate Expectations ..... 25

B. Dietrich Did Not Suffer An Adverse Employment Action Or Constructive Discharge ..... 26

C. The Undisputed Material Facts Show That Similarly-Situated Male Or Non-Disabled Employees Were Not Treated More Favorably Than Dietrich ..... 29

D. CHRW Had Legitimate Business Reasons For Its Actions ..... 30

E. There Is No Disputed Material Fact Refuting CHRW's Legitimate Business Reasons ..... 32

V. BASED ON THE UNDISPUTED MATERIAL FACTS, PLAINTIFF'S RETALIATION CLAIMS IN COUNTS V AND VI FAIL AS A MATTER OF LAW ..... 33

VI. CONCLUSION ..... 35

## TABLE OF AUTHORITIES

**Cases**

*Adams v. BSI Mgmt. Sys. Am., Inc.*,
No. 1:11-CV-2914-ODE, 2013 WL 12145000 (N.D. Ga. Feb. 12, 2013), *aff'd*, 523 F. App'x 658 (11th Cir. 2013)....7

*Ahle v. Veracity Research Co.*,
738 F. Supp. 2d 896 (D. Minn. 2010)....8

*Alek v. Univ. of Chicago Hospitals*,
54 F. App’x 224 (7th Cir. 2002)....33

*Atanus v. Perry*,
520 F.3d 662 (7th Cir. 2008)....32, 33

*Boss v. Castro*,
816 F.3d 910 (7th Cir. 2016)....34

*Brown v. GST Logistics, Inc.*,
No. 4:13-CV-197-HLM-WEJ, 2014 WL 12861575 (N.D. Ga. Aug. 14, 2014)....13, 17

*Bunn v. Khoury Enterprises, Inc.*,
753 F.3d 676 (7th Cir. 2014)....24, 25

*Conroy v. City of Chicago*,
644 F. Supp. 2d 1061 (N.D. Ill. 2009)....15

*D’Angelo v. J&F Steel Corp.*,
No. 01 C 6642, 2003 WL 1888775 (N.D. Ill. Apr. 14, 2003)....12, 17

*Demos v. City of Indianapolis*,
126 F. Supp. 2d 548 (S.D. Ind. 2000)....21

*Demos v. City of Indianapolis*,
302 F.3d 698 (7th Cir. 2002)....11, 13, 21

*Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*,
657 F.3d 595 (7th Cir. 2011)....25

*Duncan v. Thorek Memorial Hosp.*,
784 F.Supp.2d 910 (N.D. Ill. 2011)....29

*Fane v. Locke Reynolds*,
480 F.3d 534 (7th Cir. 2007)....33

*Fields v. Bd. of Educ. of City of Chicago*,
928 F.3d 622 (7th Cir. 2019)....27

*Griffin v. Potter*,
356 F.3d 824 (7th Cir. 2004) ....................27

*Grube v. Lau Indus., Inc.*,
257 F.3d 723, 728 (7th Cir. 2001) ....................28

*Harper v. C.R. England, Inc.*,
687 F.3d 297 (7th Cir. 2012) ....................35

*Haywood v. N. Am. Van Lines, Inc.*,
121 F.3d 1066 (7th Cir. 1997) ....................19, 20, 21

*Henyard v. MV Transportation*,
No. 15 C 10835, 2019 WL 1399953 (N.D. Ill. Mar. 28, 2019) ....................26

*Hottenroth v. Vill. of Slinger*,
388 F.3d 1015 (7th Cir. 2004) ....................27

*Howard v. City of Springfield, Ill.*,
274 F.3d 1141 (7th Cir. 2001) ....................24

*Isbell v. John Crane, Inc.*,
30 F.Supp.3d 725 (N.D. Ill. 2014) ....................24

*Keen v. Teva Sales & Mktg., Inc.*,
303 F. Supp. 3d 690 (N.D. Ill. 2018) ....................29, 33

*Kennedy v. Commonwealth Edison Co.*,
410 F.3d 365 (7th Cir. 2005) ....................4, 8, 13, 20

*Kennedy v. Ryder Integrated Logistics, Inc.*,
No. SA-13-CA-157-F-BHJB, 2014 WL 12873036 (W.D. Tex. Sept. 11, 2014) ............ *passim*

*Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*,
490 F.3d 558 (7th Cir. 2007) ....................34

*Kotaska v. Fed. Express Corp.*,
No. 16-CV-9321, 2018 WL 3993722 (N.D. Ill. Aug. 21, 2018) ....................34

*Lucas v. PyraMax Bank, FSB*,
539 F.3d 661 (7th Cir. 2008) ....................25

*Lumpkins-Benford v. Allstate Ins. Co.*,
987 F. Supp. 2d 807 (N.D. Ill. 2013) ....................25

*Lutz v. Ameritech Corp.*,
208 F.3d 214 (6th Cir. 2000) ....................22

*McGrath v. Gillis*,
44 F.3d 567 (7th Cir. 1995) ....................................................................................3

*McLaughlin v. Richland Shoe Co.*,
486 U.S. 128 (1988)..............................................................................................24

*Monroe v. Indiana Dep't of Transportation*,
871 F.3d 495 (7th Cir. 2017) ..................................................................................29

*Mullins* v. *Target Corp.*,
No. 09 C 7573, 2011 WL 1399262 (N.D. Ill. Apr. 13, 2011)...................................16, 17, 19

*Noble v. Northeast. Illinois Reg'l Commuter R.R. Corp.*,
130 F. Supp. 3d 1166 (N.D. Ill. 2015) ......................................................................34

*Oliver v. Joint Logistics Managers, Inc.*,
893 F.3d 408 (7th Cir. 2018) ..................................................................................32

*Olsen v. Marshall & Ilsley Corp.*,
267 F.3d 597 (7th Cir. 2001) ..................................................................................26

*Orphanos v. Charles Indus.*, Ltd.,
No. 95 C 4039, 1996 WL 437380, at *3 (N.D. Ill. July 29, 1996) ..........................................21

*Owens v. CEVA Logistics/TNT*,
No. CIV.A. H-11-2237, 2012 WL 6691115 (S.D. Tex. Dec. 21, 2012)..................................6

*Owens v. Neovia Logistics, L.L.C.*,
816 F. App'x 906 (5th Cir. 2020)............................................................................9

*Owens v. Neovia Logistics, LLC*,
No. 17-CV-1719-G-BK, 2019 WL 1411792 (N.D. Tex. Mar. 14, 2019)............................9, 13

*Palermo v. Clinton*,
437 F. App'x 508 (7th Cir. 2011) ............................................................................26

*Perine v. ABF Freight Sys., Inc.*,
457 F. Supp. 2d 1004 (C.D. Cal. 2006) ..................................................................13, 17

*Piscione v. Ernst & Young, L.L.P.*,
171 F.3d 527 (7th Cir. 1999) ...........................................................................13, 19, 23

*Puentes v. Siboney Contracting Co.*,
No. 11-80964-CIV, 2012 WL 5193417 (S.D. Fla. Oct. 19, 2012) ..................................13, 17

*Robertson v. Dep't of Health Servs.*,
949 F.3d 371 (7th Cir. 2020) ..............................................................................33, 35

*Rock v. Ray Anthony Int'l, LLC*,
380 F. App'x 875 (11th Cir. 2010) ....................13, 18

*Roe-Midgett v. CC Servs., Inc.*,
512 F.3d 865 (7th Cir. 2008) .................... *passim*

*Roney v. Illinois Dep't of Transp.*,
376 F. Supp. 2d 857 (N.D. Ill. 2005), *aff'd*, 474 F.3d 455 (7th Cir. 2007) ....................28

*Sauzek v. Exxon Coal USA, Inc.*,
202 F.3d 913 (7th Cir. 2000) ....................34

*Schaefer-LaRose v. Eli Lilly & Co.*,
679 F.3d 560 (7th Cir. 2012) ....................22

*South v. Illinois Envtl. Prot. Agency*,
495 F.3d 747 (7th Cir. 2007) ....................25

*Speer v. Rand McNally & Co.*,
123 F.3d 658 (7th Cir. 1997) ....................27

*Spinden v. GS Roofing Prod. Co.*,
94 F.3d 421 (8th Cir. 1996) ....................23

*Sun v. Bd. of Trustees of Univ. of IL*,
473 F.3d 799 (7th Cir. 2007) ....................24, 25

*Ulichny v. Merton Cmty. Sch. Dist.*,
249 F.3d 686 (7th Cir. 2001) ....................28

*Verkuilen v. Mediabank, LLC*,
No. 09 C 3527, 2010 WL 3003860 (N.D. Ill. June 27, 2010) ....................5, 20

*Watts v. SBC Servs., Inc.*,
No. 05 C 3111, 2006 WL 2224054 (N.D. Ill. July 31, 2006) ....................25

*Webster v. Pub. Sch. Employees of Washington, Inc.*,
247 F.3d 910 (9th Cir. 2001) ....................6, 9, 10

*Wheeler v. Lawson*,
539 F.3d 629 (7th Cir. 2008) ....................3

*Williams v. Brooks*,
809 F.3d 936 (7th Cir. 2016) ....................34

*Withrow v. Sedgwick Claims Mgmt. Serv., Inc.*,
841 F. Supp. 2d 972 (S.D. W. Va. 2012)....................8

*Yi v. Sterling Collision Ctrs., Inc.*,
480 F.3d 505 (7th Cir. 2007) ....................3

*Zannikos v. Oil Inspections (U.S.A.) Inc.*,
No. CV- 12-2508, 2014 WL 12771511 (S.D. Tex. Jan. 30, 2014)....................9, 13

**Statutes**

29 U.S.C. § 213(a)(1)....................4

Americans With Disabilities Act ....................3, 24, 25, 34

Fair Labor Standards Act .................... *passim*

Illinois Minimum Wage Law
820 ILCS 105/4a....................2, 4

Title VII of the Civil Rights Act of 1964....................*passim*

**Rules**

Fed. R. Civ. P. 56(c)(1)....................3

Norther District of Illinois Local Rule 56.1....................1

**Regulations**

29 C.F.R. § 541.200(a)(1)....................4

29 C.F.R. § 541.200(a)(2)....................4, 7, 8

29 C.F.R. § 541.200(a)(3)....................4

29 C.F.R. § 541.201(a)....................5

29 C.F.R. § 541.201(c)....................9

29 C.F.R. § 541.202(a)....................14, 15

29 C.F.R. § 541.202(b) ....................15

29 C.F.R. § 541.202(c)....................20

29 C.F.R. § 541.205(b) ....................5, 12

29 C.F.R. § 541.205(c)....................5, 6

29 C.F.R. § 541.205(c)(5)....................6

29 C.F.R. § 541.205(d) ....................6, 11

29 C.F.R. § 541.700 ....................11

29 CFR § 541.201(b) ....................12

# INTRODUCTION[1]

CHRW operates in a demanding and cutting edge industry that provides third-party transportation logistics through a combination of freight transportation services, logistics solutions, and supply chain services. CHRW provides these services to its customers through global transportation and distribution networks that CHRW maintains, grows, and cultivates. Depending on its customers' supply chain needs, CHRW researches, selects, and advises its customers on the appropriate transportation mode for shipments and then contracts with motor carriers to arrange the transport of its customers' freight. CHRW's services range from commitments on a specific shipment to developing comprehensive and integrated relationships with customers.

Given the complexity of supply chain logistics, advising customers on supply chain trends and troubleshooting the shipping process is not simple. But it is always urgent. The solutions to supply chain problems or the demand to locate a suitable carrier are not always apparent. Resolving such matters requires a sophisticated understanding of the supply chain markets, problem solving skills, and the expertise, judgement, and skill-set to balance carrier trends and customer needs.

Fortunately for CHRW, it has group of employees whose skill and market expertise provide the crucial logistics support to its customers. They are Carrier Account Managers, Capacity Account Managers, Capacity Key Account Managers (collectively "CAMs"), and Senior Carrier Account Managers ("SCAMs"), referred to collectively as Carrier Managers ("CMs") – the positions at issue in this motion.

[1] This Memorandum is supported by an accompanying Statement of Facts ("SOF") pursuant to Northern District of Illinois Local Rule 56.1. References to it are designated as SOF, at ____.

CMs are CHRW's principal representatives to carriers and the most sophisticated advisers to its Customer Representatives. They leverage their industry experience to advise, troubleshoot, negotiate pricing, deliver solutions, and solve problems critical to CHRW's customers. Balancing the competing interests of the customers and carriers is not easy; nor is it routine. It requires tact and sound judgment. As Plaintiff admitted, she tried to "balance interests and come to a resolution that worked for everybody." SOF ¶¶ 52-53. There is no script on how to do this, and these skills and duties are by definition discretionary and inherently imbued with judgment.

No material issues of fact exist with respect to the job duties assigned to CMs. Those duties are discussed in detail in CHRW's job descriptions and year-end performance reviews, as well as the testimony of Plaintiff, CHRW's General Managers in the Chicago Central office, and the CMs who worked alongside members of the class.

Those responsibilities are consistent with CHRW's decision to classify CMs as exempt from the overtime requirements of the Illinois Minimum Wage Law ("IMWL") and the Fair Labor Standards Act ("FLSA"). Plaintiff's claim that the CM job positions were misclassified fails as a matter of law, as the undisputed material facts demonstrate that Plaintiff: (a) was paid on a salary basis, (b) performed duties directly related to CHRW's business operations or its customers' operations; and (c) exercised independent judgment and discretion on matters of significance. Accordingly, Plaintiff was properly classified as exempt from the overtime requirements of the FLSA and IMWL, and partial summary judgment as to Plaintiff's claims is appropriate on Counts I and II of the Complaint.

Summary judgment is also appropriate as to Plaintiff's individual discrimination claims. Plaintiff asserts four individual claims against CHRW, including gender discrimination under

Title VII (Count III); disability discrimination under the ADA (Count IV); retaliation brought under Title VII (Count V); and retaliation under the ADA (Count VI). None of Plaintiff's claims can survive summary judgment because the undisputed material facts show that Plaintiff: (i) cannot establish a *prima facie* case of gender discrimination or demonstrate that CHRW's legitimate, non-discriminatory reasons for its actions were false or a pretext for discrimination; (ii) cannot establish a *prima facie* case for disability discrimination or demonstrate that CHRW's legitimate, non-discriminatory reasons for its actions were false or a pretext for discrimination; and (iii) cannot establish a *prima facie* case of retaliation.

Accordingly, Plaintiff's individual claims fail as a matter of law, and this Court should grant summary judgment to Defendant.

## ARGUMENT

### I. SUMMARY JUDGMENT STANDARD

The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). In FLSA exemption cases, the employer must prove by a preponderance of the evidence that the position in question falls within one of the FLSA's enumerated exemptions. *See Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 506-08 (7th Cir. 2007). The opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must, by affidavits or as otherwise provided in Rule 56, set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. The non-moving party must show that there is evidence upon which a jury reasonably could find for [it]." *Wheeler*, 539 F.3d at 634. Summary judgment against a party is thus appropriate where that party does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *McGrath v. Gillis*, 44 F.3d 567, 569 (7th Cir. 1995).

## II. PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED AS TO COUNTS I AND II BECAUSE THE UNDISPUTED MATERIAL FACTS ESTABLISH THAT PLAINTIFF MEETS THE ADMINISTRATIVE EXEMPTION TEST

The FLSA exempts from the overtime pay requirement those employed in an "administrative . . . capacity." 29 U.S.C. § 213(a)(1).[2] The regulations set forth a three-part test for determining whether an employee falls under the administrative exemption. First, the employee must be compensated on a salary basis at a rate of not less than $455 per week. 29 C.F.R. § 541.200(a)(1). Second, the employee's primary duty must be the performance of office or non-manual work "directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). Finally, the employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a)(3). As a CM, Dietrich meets all three requirements and thus qualifies for the FLSA's and IMWL's administrative exemption.

### A. CMs Satisfy The Salary Test Of The Administrative Exemption

Dietrich earned a salary (including commissions) of approximately $110,457.34 in 2015; $185,832.38 in 2016; and  $55,965.15 in 2017. SOF ¶ 74. CMs, including Dietrich, at all relevant times were paid a predetermined set salary of $38,000 or $48,000 on a bi-weekly basis.

[2] In Count II of the Complaint, Plaintiff brings a claim for overtime wages under the IMWL. (ECF No. 42.) The IMWL exempts from its overtime requirements employees who are employed in an administrative capacity. 820 ILCS 105/4a. This Court previously held that the "IMWL applies the administrative exemption 'as defined by or covered by the [FLSA] and the rules adopted under that Act, as both exist on March 30, 2003'" and "for CHRW to prevail on its administrative-exemption defense, "it must establish that Plaintiff is exempt under the FLSA exemptions that existed as of March 30, 2003." (ECF No. 179 at 2-3.) (citation omitted.) Because Plaintiff's FLSA claim fails, her "related state law claims under the IMWL must fail as well." *Kennedy v. Commonwealth Edison Co*., 410 F.3d 365, 376 (7th Cir. 2005).

*Id*. Hence, there is no issue of material fact regarding CMs' salaries as to 29 C.F.R. § 541.200(a)(1).

### B. CMs' Primary Duty Was Office Or Non-Manual Work Directly Related To The General Business Operations Of CHRW Or Its Customers

CHRW's business operations include a wide range of supply chain services offered to its customers, who require freight shipping logistic services. SOF ¶ 7. CMs service the operations of CHRW's customers by advising Customer Representatives on carrier market conditions, selecting and hiring an appropriate carrier, and managing the shipping process, including crafting solutions for the customers and resolving problems that arise along the way. *Id*. ¶¶ 14-19.

Under the administrative exemption, an employee must perform work directly related to assisting with the running or servicing of the employer's business, or its **customer's business**, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail service establishment. 29 C.F.R. § 541.201(a) (emphasis added); *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 872 (7th Cir. 2008); *Verkuilen v. Mediabank, LLC*, No. 09 C 3527, 2010 WL 3003860, at *1-2 (N.D. Ill. June 27, 2010).

The administrative operations of the business include "work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b). The phrase "directly related to management policies or general business operations," is not limited to persons who formulate management policies or operate the business as a whole. 29 C.F.R. § 541.205(c). Employees whose work affects policy or whose responsibility it is to execute or carry out policy are also included within this phrase. *Id*. The phrase further includes "a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects

business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business." *Id*. Persons employed as advisory specialists and consultants, for example, fall within this requirement. 29 C.F.R. § 541.205(c)(5).

Central to the analysis here, the "management policies or general business operations" at issue within this requirement may be those of the employer **or the employer's customers**. 29 C.F.R. § 541.205(d). "For example, many bona fide administrative employees perform important functions as advisors and consultants but are employed by a concern engaged in furnishing such services for a fee." *Id*; *see also Webster v. Pub. Sch. Employees of Washington, Inc*., 247 F.3d 910, 915 (9th Cir. 2001) (analyzing primary duties test in context of work related to the employer's customers, as opposed to the employer itself); *Owens v. CEVA Logistics/TNT*, No. CIV.A. H-11-2237, 2012 WL 6691115, at *10 (S.D. Tex. Dec. 21, 2012) (explaining that had defendant raised the argument, plaintiff "might have qualified as an exempt administrative employee because CEVA's logistics services arguably facilitated the general business operations of Chrysler, its customer"). If these employees satisfy the other requirements of the administrative exemption, they qualify for the exemption regardless of whether their work is directly related their employer or their employer's customers.

The Seventh Circuit's decision in *Roe-Midgett*, 512 F.3d at 872, makes this point clear. There, plaintiffs alleged that Material Damage Appraisers ("MDAs") working as claims administrators at CC Servicing were misclassified as exempt. *Id*. Plaintiffs argued that the duties of a MDA were not "directly related" to the employer's business operations because CC "produces" claims-processing services (though not the underlying policies) and therefore MDAs were essentially responsible for "producing" CCS's "product." *Id*.

The Seventh Circuit rejected this contention. It explained:



66321524v.8

> This argument hinges on a distinction between in-house claims processing by insurance companies, which the plaintiffs view as ancillary to the 'production' of the policies themselves, and outsourced claims processing of the type performed by CCS, which they interpret as a 'product' unto itself. Under the Department of Labor's interpretive regulations, however, this distinction is immaterial, as 'administrative] operations of a business' may 'be those of the employer *or* **the employer's customers.'**

*Id*. (citing 29 C.F.R. § 541.205(a), (d)) (second emphasis added). The Seventh Circuit therefore concluded that because "CCS's customers are insurance companies in the business of selling policies" the MDAs "who process claims against those policies are performing an administrative function for CCS's customers." *Id*.

The reasoning of *Roe-Midgett* is controlling here. In the same way that the MDAs in *Roe-Midgett* were performing an administrative function for their employer's *customers*, the CMs here are performing an administrative function for CHRW's *customers*. *Id*. CHRW's customers are companies like "Procter & Gamble or Johnson & Johnson that have product that needs to be moved across the country." SOF ¶ 8. CMs service these companies by advising them on their supply chain requirements, locating carriers to ship their products, negotiating rates for those shipments, and then overseeing and troubleshooting the process. *Id*. ¶ 14-19. In other words, CMs rely on their expertise of the carrier market to provide CHRW's customers with logistics services that the customer does not provide "in-house" itself. *Roe-Midgett*, 512 F.3d at 872.

If the CMs were employed at a non-logistics company, Dietrich would have to concede that their job duties were "directly related to the management or general business operations of" of those companies . . . ." 29 C.F.R. § 541.200(a)(2).[3] But because the CMs perform

---

[3] *See Adams v. BSI Mgmt. Sys. Am., Inc*., No. 1:11-CV-2914-ODE, 2013 WL 12145000, at *7 (N.D. Ga. Feb. 12, 2013), *aff'd*, 523 F. App'x 658 (11th Cir. 2013) (stating that had plaintiff been hired by one of the customers to provide supply chain security analysis, "she would clearly be exempt as performing work related to the company's general business operations; therefore, as an outside consultant performing the same work, she is also exempt.").

"outsourced" logistic services at a company that provides third party logistics services, Dietrich (in her pleadings thus far) incorrectly casts CMs as the equivalent of post-industrial production workers.

This is the exact characterization that the Seventh Circuit rejected in *Roe-Midgett*. *Id*. (rejecting the "distinction between in-house claims processing by insurance companies, which the plaintiffs view as ancillary to the 'production' of the policies themselves, and outsourced claims processing of the type performed by CCS."). Indeed, the Seventh Circuit opined that:

> The administrative exemption turns on how employees spend their day, not who signs their paycheck. It would be strange to conclude that a claims-processing employee at a third-party service company like CCS is entitled to overtime while his in-house counterpart at XYZ Insurance Co. is not.

*Id*. at 872. Other courts have reached similar conclusions in rejecting plaintiffs' attempts to cast employees as production employees simply because they generate the product the employer offers. *See Withrow v. Sedgwick Claims Mgmt. Serv., Inc.*, 841 F. Supp. 2d 972, 979 (S.D. W. Va. 2012) ("I do not accept the plaintiffs' contention that Claims Examiners are like production employees because they generate the product that Sedgwick offers to the public."); *Ahle v. Veracity Research Co.*, 738 F. Supp. 2d 896, 903 (D. Minn. 2010) (same).

In analyzing similar job positions to the CM positions, the U.S. District Court for the Western District of Texas held that freight logistic analysts were properly classified as exempt because they performed non-manual work directly related to the management or general business operations of the defendants' *customer* – not the defendants themselves. *Kennedy v. Ryder Integrated Logistics, Inc.*, No. SA-13-CA-157-F-BHJB, 2014 WL 12873036, at *5-6 (W.D. Tex. Sept. 11, 2014). In *Kennedy*, the court rejected plaintiffs' contention that "coordinat[ing] shipments of materials for production lines" was production work because that was "the product or service that the employer's business offers to the public." *Id*. Instead, the court concluded that

the "logistics work" that plaintiff did "was directly related to the general business operations of Toyota" which was the *customer* of the defendant. *Id*.; *see also Owens v. Neovia Logistics, LLC*, No. 17-CV-1719-G-BK, 2019 WL 1411792, at *1 (N.D. Tex. Mar. 14, 2019) (rejecting argument that employee did production work where plaintiff provided logistic services and "Defendant is in the business of providing logistics services to its clients").

A similar conclusion was reached in *Zannikos v. Oil Inspections (U.S.A.) Inc*., No. CV-12-2508, 2014 WL 12771511, at *1 (S.D. Tex. Jan. 30, 2014). There, the employer's "primary function is to oversee and monitor transfers of oil between containers" and the employees at issue were "engaged in quality control and directly supervised oil transfers." *Id*. Plaintiffs, therefore, argued that "employees that provide the precise service offered by the employer, are necessarily engaged in production not administration." *Id*. The court rejected this argument. It noted that plaintiff's contention "only considered whether plaintiff's duties were related to the management of the employer, not the customer." *Id*. The court explained that "Plaintiff's broad reading of this case would necessarily conflict with 29 C.F.R. § 541.201(c), which provides that the provision of management services to *customers* may qualify employees for the administrative exemption." *Id*. Thus, the court found that "because of the role that marine superintendents played in the general operations of Oil Inspections' customers, the position is more administrative than productive." *Id*.

Similarly, in *Webster v. Pub. Sch. Employees of Washington, Inc*., 247 F.3d 910, 915 (9th Cir. 2001), the Ninth Circuit rejected plaintiff's rigid application of the production/administrative dichotomy and concluded that plaintiff performed work directly related to the business operations of his employer's *customers*. There, plaintiff was employed by a labor union that represented state school employees. *Id*. As a field representative, plaintiff was responsible for

negotiating collective bargaining agreements on behalf of "bargaining units," consisting of the union's members. *Id*. Plaintiff argued that he performed production work, not administrative work "[b]ecause the primary service goal of the bargaining units is to secure collective bargaining agreements and [plaintiff's] primary duty is to negotiate the agreements . . . ." *Id.* The Ninth Circuit found plaintiff's reliance on the production/administrative dichotomy "unpersuasive" and concluded that plaintiff's work was '"directly related to management policy or general business operations of . . . his employer's customers,' the bargaining units." *Id*. at 916. "This conclusion," the Ninth Circuit explained, "is also supported by a sensible application of the administrative work/production dichotomy," the purpose of which "is to clarify the meaning of 'work directly related to the management policies or general business operations,' not to frustrate the purpose and spirit of the entire exemption." *Id*.

***1. CMs Provide A Crucial Administrative Service To CHRW's Customers By Advising On Carrier Market Conditions And Securing Appropriate Capacity***

Similar to the cases discussed above, employees in the CM positions provide a fundamental administrative service to CHRW's customers. CHRW's customers are companies across all industries – and include manufacturers, distributors, and wholesalers – that are in need of a third party to facilitate their transportation of freight. SOF ¶¶ 8, 16-17. Employees in the CM positions serve as logistic advisors and consultants to these customers and act as the customer's principal representative to the carriers used to provide CHRW's logistics services. SOF ¶¶ 16-17. As one employee in the CM position has affirmed:

> [T]he commercial side of the business leans on me for advice and consulting on selling the business and penetrating the market. Some customer's come to me directly for assistance. My expertise in advising the customer side of the business is in retail consolidation (combining purchases orders that deliver to big box retailers) . . . . I provide strategic consulting within the traditional and retail consolidation verticals from sales support, implementation and execution.

*Id.* ¶ 20; *see* 29 C.F.R. § 541.205(d) ("many bona fide administrative employees perform important functions as advisors and consultants but are employed by a concern engaged in furnishing such services for a fee").

The undisputed material facts show that CMs' primary duty is to service these customers by securing capacity for their freight, which, at a high-level, means cost-effectively arranging the transport of CHRW's customers' freight. SOF ¶ 17. The process of securing capacity for a customer involves building a portfolio of carriers, locating, selecting, and hiring appropriate contracted carriers to ship their products, negotiating rates for those shipments, and then quality control – solving problems, as well as overseeing and troubleshooting the entire process, from origin to destination. *Id*. ¶¶ 17-21. All of these duties are encompassed within securing capacity and are relevant. *See Demos v. City of Indianapolis*, 302 F.3d 698, 704-05 (7th Cir. 2002) ("totality of plaintiff's duties are relevant"); 29 C.F.R. § 541.700 ("Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.").

In order to secure capacity for CHRW's customers, CMs represent CHRW and its customers and function as the primary point of contact between the customer or CHRW, on the one hand, and the carriers used to ship the customer's freight, on the other hand. (SOF ¶¶ 16-17.) Choosing the appropriate carrier for a customer requires an understanding of the needs of the customer and the carrier, as well as industry knowledge and expertise concerning market trends, which CMs acquire through research. *Id.* ¶¶ 22-32, 55-56. And after an appropriate carrier is selected, CMs negotiate the price with the carrier, hire them, and then are responsible for quality control over the shipping process and ensuring that "the deliveries are fulfilled." *Id*. ¶¶ 34, 46-54.

These services fall under the administrative operations of CHRW's customers. *See* 29 C.F.R. § 541.205(b) ("the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, **negotiating**, **representing** the company, purchasing, promoting sales, and business **research** and control.") (emphasis added); 29 CFR § 541.201(b) ("[W]ork in functional areas such as **quality control** . . . " is considered management or general business operations.) (emphasis added).

These are also the same job responsibilities that this Court held qualified a similar type of employee for the administrative exemption. In *D'Angelo v. J&F Steel Corp.*, No. 01 C 6642, 2003 WL 1888775, at *5 (N.D. Ill. Apr. 14, 2003), this Court held that a "shipping manager" employed by a steel company fell within the administrative exemption. There, the plaintiff's responsibilities "revolved around shipping" and included "coordinat[ing] with truck lines so that trucks could be used to both bring in and ship out material" and "help[ing] solve any problems that truckers might encounter." *Id.* This Court held that these duties "influenced" the employer's operations and that "coordinating shipping and dealing with customer problems, clearly demonstrate plaintiff's use of discretion and independent judgment." *Id.*

The plaintiff's primary job duties in *D'Angelo* – "coordinating shipping" – are not materially different than the primary job duties at issue here. The only difference is that, in *D'Angelo*, the plaintiff performed those functions "in-house" and here those same duties are performed at a company that provides logistics services to its customers. But as the Seventh Circuit has made clear, "this distinction is immaterial," because the regulations provide that "'administrative] operations of a business' may 'be those of the employer *or* the employer's customers.'" *Roe-Midgett*, 512 F.3d at 872 (citing 29 C.F.R. § 541.205(a), (d)).[4]

[4] In support of the claim that the CMs perform production work, Plaintiff has previously argued that CHRW employs "scores" of CMs. (ECF No. 147 at 7.) The Seventh Circuit however has rejected this

The undisputed material facts establish that CMs performed a key administrative and operational service to the customers' businesses, as distinguished from working in the actual production line. Courts in other jurisdictions have found that similar job duties and logistics positions satisfy the administrative exemption. *See Kennedy*, 2014 WL 12873036, at *6 ("While Plaintiff's work coordinating materials for shipment helped facilitate Toyota's [Defendant's customer] production lines, he has not presented evidence that his duties involved actual work on Toyota's production lines . . . ."); *Zannikos,* 2014 WL 12771511, at *6 ("[T]he regulations provide that these duties still meet the second prong of the administrative exemption when they are provided to customers as opposed to the employer."); *Owens*, 2019 WL 1411792, at *1; *Puentes v. Siboney Contracting Co*., No. 11-80964-CIV, 2012 WL 5193417, at *5 (S.D. Fla. Oct. 19, 2012); *Perine v. ABF Freight Sys., Inc*., 457 F. Supp. 2d 1004, 1016 (C.D. Cal. 2006); *Brown v. GST Logistics, Inc*., No. 4:13-CV-197-HLM-WEJ, 2014 WL 12861575, at *8 (N.D. Ga. Aug. 14, 2014); *Rock v. Ray Anthony Int'l, LLC*, 380 F. App'x 875, 877 (11th Cir. 2010).

In addition to the responsibilities discussed above, the CMs's mentoring, training, and supervisory responsibilities also support a finding that their role is administrative. CMs spend a portion of their time mentoring and training junior carrier-side employees and/or supervising a support team, which assists them with locating and posting equipment, and responding to email. SOF ¶¶ 57-62. Mentoring and training are important leadership job functions. (*Id*.) *See Demos,* 302 F.3d at 705 (considering the "employee's autonomy and authority in his or her organization"); *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 535-36 (7th Cir. 1999) ("Supervisory and training responsibilities . . . are evidence of duties that are administrative in

---

argument: '"[t]he fact that there are a number of other employees of the same employer carrying out assignments of the same relative importance or performing identical work does not affect the determination of whether they meet this test so long as the work of each employee is of substantial importance . . . ."' *Kennedy* 410 F.3d at 373 (citing 29 C.F.R. § 541.205(a)(6)).

nature.”). CHRW’s expectations for CMs to supervise a team were communicated to them in their year-end performance reviews. In Dietrich’s 2016 Year-End Performance Review, one of the competencies is “Develop Self and Team” and includes “coaching and development” and states: “[c]reates a team with the right people in the right role” and “defines roles and sets goals.” *Id*. ¶¶ 44, 53. This competency reinforces the testimony in this case that CMs were expected to and did supervise a team of junior employees.[5]

In sum, Dietrich and CMs are simply not the post-industrial equivalent of employees who work on a manufacturing line and any attempt by Dietrich (despite her six figure per year take home pay) to classify herself alongside production workers fails. Rather, Dietrich undeniably performed duties that constituted non-manual work directly related to the general business operations of CHRW’s customers. Accordingly, the Court should find that CMs satisfy the second requirement of the administrative exemption test.

**C. The CM Positions Required The Exercise Of Independent Judgement And Discretion With Respect To Matters Of Significance**

The undisputed material facts establish that employees in the CM positions routinely exercise independent judgment and discretion in addressing the freight needs of CHRW’s customers and acting as the principal representative to the carriers that CHRW contracts with to provide logistic services to its customers. “To qualify for the administrative exemption an employee’s primary duty must include the exercise of independent judgment and discretion with respect to matters of significance.” 29 C.F.R. § 541.202(a). “[T]he exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.”

[5] The written job descriptions for a SCAM includes “[m]entor[ing] those in the Carrier Representative and Carrier Account Manager roles; provid[ing] coaching, help[ing] solve problems . . . . ” SOF ¶ 59.

*Id*. Factors relevant to a determination of whether a job duties call for discretion and independent judgment include:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; . . . [and] whether the employee investigates and resolves matters of significance on behalf of management . . . .

29 C.F.R. § 541.202(b).

The CM positions are directly within this framework. To begin with, the written job "Competencies" for the CM positions specify, among other things:

> Identifying and understanding problems and opportunities by gathering, analyzing, and interpreting quantitative and qualitative information; choosing the best course of action by establishing clear decision criteria, generating and evaluating alternatives, and making timely decisions; taking action that is consistent with available facts and constraints and optimizes probable consequences.

(SOF ¶ 68.)

Those same "Competencies" are also clear that a CM "[c]reates relevant options for addressing problems and opportunities" and "[a]ssesses options against clear decisions criteria while consider implications and consequences." *Id.*; *see Conroy v. City of Chicago*, 644 F. Supp. 2d 1061, 1069 (N.D. Ill. 2009) (finding that written job qualifications "further corroborat[ed] the claim that Superintendents exercise discretion"). These competencies are the very definition of discretion and independent judgment. *See* 29 C.F.R. § 541.202(a) ("[T]he exercise of discretion . . . involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.").

Consistent with these core competencies, the undisputed material facts demonstrate that CMs exercise significant discretion in building and managing their carrier portfolio, selecting

and hiring appropriate carriers for a particular shipment, negotiating pricing, and troubleshooting the shipping process.

### *1. Building A Carrier Portfolio Required Discretion And Independent Judgment*

A detailed written job description for the CM positions states that a CM "[m]aintains and grows relationships with existing carriers" and "[a]dds new carriers . . . by researching carriers in the marketplace." (SOF ¶ 66.) Dietrich admitted these were her duties and what is more admitted that every CM "had a *different* structure of how they built their portfolio." *Id*. ¶¶ 23, 25. In other words, CMs had discretion to determine *how* to build their portfolio and *which types* of carriers to target. *Id*. ¶¶ 22, 24, 26 ("Which potential carriers I contact and how I develop those relationships, are all decisions I make . . . ."). Dietrich, for instance, focused on the "relationships that [she] was able to build with the carriers, whereas other CMs focused on adding carriers based "off of certain lanes they've developed . . . ." *Id*. ¶ 25.

Dietrich's testimony is corroborated by the vast differences in the makeup of carrier portfolios and by the testimony of CMs discussing their individualized strategies for building a portfolio. *Id*. ¶ 26. For example, CMs had discretion to choose the number of carriers, the size of their fleets, their lanes, their geographic regions, and their specialty. *Id*. ¶ 24; *Mullins* v. *Target Corp*., No. 09 C 7573, 2011 WL 1399262, at *9 (N.D. Ill. Apr. 13, 2011) (finding "independent judgment and discretion . . . in selecting and planning out strategies and tactics"). Hence, there is no dispute that CMs utilized different strategies to build portfolios and the common denominator among them is their discretion and independent judgment to choose their own strategy.

### *2. Selecting A Carrier Required Discretion And Independent Judgment*

Selecting and hiring a carrier is one of the most important decisions that a CM makes for CHRW's customers, and CMs decide which carrier to use for a particular shipment. SOF ¶ 27.

The process of choosing a suitable carrier requires "evaluating existing carrier relationships and where to identify capacity to move a customer's load." *Id*. ¶ 28.

Factors that went into this determination included the type of the carrier's equipment, the lanes they operate in, whether a carrier needs to reposition equipment, and the carrier's focus (e.g., Hazmat or food products). *Id*. ¶ 32. Dietrich, moreover, admitted that she "evaluated which carriers are solid and reliable" and that she considered whether "it is a good carrier . . . they can hit pickup on time, [sic] they could hit on time delivery." *Id*. ¶ 28. Dietrich also considered the customer's product that needed to be shipped, the weight, the rates, and the distances. *Id*. ¶ 30; *Mullins*, 2011 WL 1399262, at *8 (finding plaintiff exercised discretion and independent judgment because "she compared and evaluated possible courses of conduct and made decisions after considering the possibilities.").

Courts have concluded that similar job responsibilities involving transportation logistics required the exercise of discretion and independent judgment. For example, this Court concluded that "coordinating shipping and dealing with customer problems, clearly demonstrate plaintiff's use of discretion and independent judgment." *D'Angelo*, 2003 WL 1888775, at *5. Similarly, in *Perine*, 457 F. Supp. 2d at 1016, the court concluded that an operations manager exercised discretion and independent judgment where he was responsible for assigning pickups based on different factors, including the "pickup's location," "trailer space," and "the number of pickups." Further, in *Puentes*, 2012 WL 5193417, at *5, the employer provided "trucking services for the hauling of aggregates to and from job sites to their customers." The court concluded that plaintiff exercised discretion in selecting trucks based on "the particular needs of a job; the dimensions, capacities and sizes of the trucks; the reliability and qualifications of the drivers; the age and quality of the trucks and the distance of the hauls." *Id*. Likewise, in *Brown*,

2014 WL 12861575, at *8, the court held that a plaintiff employed by a freight brokerage company exercised discretion where "[o]nce a motor carrier was set up with GST, [plaintiff] would use it as he deemed fit to ship freight for GS's customers." *See also Rock*, 380 F. App'x at 877 (finding a dispatcher exempt where he was "responsible for selecting the type of materials, supplies, machinery, equipment, and tools that were needed to meet the customers' needs").

Here, CMs analyze similar factors in selecting and contracting with an appropriate carrier (whether the carrier has capacity, appropriate equipment, and their lanes). SOF ¶¶ 27-32. The evidence establishes that when selecting an appropriate carrier, CMs gather this information and "weigh the benefits and disadvantages of a given carrier for a particular job." *Id*. ¶ 31; *Kennedy*, 2014 WL 12873036, at *7 (finding a logistics coordinator exercised discretion where he "made such decisions based on information he obtained on his own").

***3. Negotiating Carrier Rates Requires Discretion And Independent Judgment***

The CM written job descriptions also specify – and Dietrich admitted – that CMs "negotiate rates." SOF ¶¶ 34, 66. Generally, CHRW sets a suggested target price, called a "max buy," but CMs have *discretion* to accept different rates that would produce less profits, or even a loss on shipment depending upon the circumstances and their discussion with the Customer Representatives. *Id*. ¶¶ 34-35. As Dietrich testified,

> **Q:** Within the pricing schedule as a Carrier Account Manager or Senior Carrier Account Manager, you had the flexibility to negotiate anywhere within that pricing schedule to the carrier, right?
>
> **A:** Yes.
>
> **Q:** Was it possible to negotiate beyond the pricing schedule such that the price was above the maximum price set by the pricing team?
>
> **A:** Yes.

*Id*. ¶ 36.; *Haywood v. N. Am. Van Lines, Inc*., 121 F.3d 1066, 1073 (7th Cir. 1997) (finding "some latitude in negotiating" was "indicative of the exercise of discretion and independent judgment"). Dietrich also admitted that in certain circumstances she could make the final decision regarding negotiating a price above the maximum. SOF ¶ 38.

CMs worked closely with Customer Representatives to determine the best rates, and Dietrich admitted that when it was necessary to negotiate beyond the pricing schedule, in effect she was then "negotiating" with the Customer Representative to convince them to agree to her proposed price. *Id*. ¶40. The Seventh Circuit has opined that this dynamic is indicative of the exercise of discretion and independent judgment, since "many individuals who exercise discretion and independent judgment often do so after consultation with others. This is because consultation implies an exchange of views . . . ." *Piscione*, 171 F.3d at 536-37.

Far from being formulaic, negotiating pricing required that the CM understand the customer's needs and expectations vis a vis the carrier market. SOF ¶¶ 41-43, 46. CMs weighed "the factors related to pricing" – freight to truck ratio, weather, and lanes – and "decide what pricing is suitable for a particular job." *Id*. ¶ 42. Ultimately, CMs may decide to: (1) accept a carrier's counter-offer; (2) make a counter-offer to the carrier; (3) pass on that particular carrier and continue to search for another carrier; (4) contact the customer to discuss rates; (5) change the recommended cost of the load; or (6) cancel a load that has been booked. *Id*. ¶ 45.

Simply because CMs negotiate within a range set by CHRW, does not suggest that they lack discretion or independent judgment. *Mullins*, 2011 WL 1399262, at *8 ("[U]se of the directives that Investigators were expected to follow does not imply a lack of discretion or judgment."); *Haywood*, 121 F.3d at 1073 (holding that employee was exempt even though she used employer guidelines to perform her job duties).

Nor does the fact that a Customer Representative must sometimes agree to a price over the max buy imply a lack of discretion and independent judgment. It is well settled that "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level."[6] 29 C.F.R. § 541.202(c); *Verkuilen*, 2010 WL 2011713, at *4. Indeed, "[t]he term 'discretion and independent judgment' as used in the regulations . . . does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review." *Haywood*, 121 F.3d at 1073 (citing 29 C.F.R. § 541.207(e)(1)); *Kennedy v. Commonwealth Edison Co*., 410 F.3d 365, 374-75 (7th Cir. 2005) ("The fact that others may review or even reverse an employee's judgment does not mean . . . that the employee will fall outside the FLSA's administrative exemption."); *Roe-Midgett*, 512 F.3d at 873 (the employee's choices "need not be final or otherwise immune from review").

***4. Troubleshooting Problems Require Discretion And Independent Judgment***

The written job description for the CM positions are also clear that when addressing "event resolutions," a CM "identities potential issues, determines the best course of action, and implements solutions." SOF ¶ 66. The same job descriptions also state that a CM "suggests strategies for carrier accounts to improve and/or sustain performance against quality standards" and "identifies areas to leverage other resources . . . and recommends implementation to improve [CHRW's] relationship with the carrier." *Id*.

Dietrich admitted that her job duties included holding carriers accountable for meeting contracted performance standards, and *identifying* opportunities for carriers to gain efficiency. *Id*. ¶ 50. Dietrich also admitted that her job responsibility included "troubleshooting" and when

[6] This is not to suggest that Customer Representatives were senior to CMs. To the contrary, Customer Representatives and CMs function as peers. SOF ¶ 19.

resolving an "event," she was "trying to balance" competing "interests" and "come to a resolution that worked for everybody":

> I would try to come to a solution where the customer relationship would not be tarnished and my relationship with the carrier would be not tarnished, where both parties would not be upset.

*Id*. ¶¶ 50-53.

The CMs' job duties thus included determining *how* to resolve an "event" (*i.e*., a shipping problem) and whether in their own judgment that required communication with the carrier, the customer, or escalating an issue to internal CHRW teams. *Id*. ¶¶ 48-49.; *Kennedy*, 2014 WL 12873036, at *7 (finding that logistics coordinators exercised discretion and independent judgment "concerning certain decisions pertaining to delivery of products"); *Demos v. City of Indianapolis*, 126 F. Supp. 2d 548, 562 (S.D. Ind. 2000) ("Problem-solving generally requires the exercise of discretion and independent judgment").

As one CM stated with respect to resolving shipping problems, "what I recommend to do in that situation depends on the customer's and carrier's needs. I have discretion to make recommendations to the customer to resolve the issue." SOF ¶ 54; *Orphanos v. Charles Indus.*, Ltd., No. 95 C 4039, 1996 WL 437380, at *3 (N.D. Ill. July 29, 1996) ("plaintiff maintained the independence and discretion to suggest solutions to the customers' problems . . . ."). In Dietrich's own words, she would "try to put the fire out." SOF ¶ 50.

These are a classic examples of discretion and independent judgment and place Dietrich squarely within the administrative exemption, much like others whose primary duties involve troubleshooting. *Demos*, 302 F.3d at 704-05 (employee who "put out fires" for his supervisor met the "discretion and independent judgment" test); *Haywood*, 121 F.3d 1066, 1073 (finding employee exercised discretion and independent judgment where the job descriptions indicated

the "essential functions are to 'resolve and provide assistance with problems,' 'investigate and resolve' billing problems."); *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 582 (7th Cir. 2012) (explaining that the factors relevant to discretion and independent judgment include "troubleshooting or problem-solving activities") (citing 29 C.F.R. § 541.202(b)).

Dietrich's performance reviews also demonstrate how the exercise of discretion and independent judgment were an integral part of her job duties and responsibilities as a CM. In Dietrich's 2016 Year-End Review, for example, one of the competencies is "Create Solutions." *Id.* ¶ 70. Under this competency, a CM is evaluated on whether he or she:

> Comes up with creative and innovative solutions to meet customer needs . . . Analyzes problems; gathers the right information, evaluates data and gets to the root cause. Is decisive. Displays courage and takes calculated risks.

*Id*. Similarly, under a competency called "Understand the Big Picture," a CM is evaluated regarding whether he or she "[d]isplays visionary, strategic, long-term thinking" *Id.* These Year-End Reviews demonstrate that CMs do not merely perform rote work but operate at level of sophistication that requires discretion and independent judgment. *See Lutz v. Ameritech Corp.*, 208 F.3d 214 (6th Cir. 2000) (analyzing job description and performance reviews to determine that plaintiff exercised discretion and independent judgment).

Consistent with these expectations, when recruiting, CHRW requires a college degree and "look[s] for intelligent individuals that have the ability to think on their feet" and perform "problem resolution." SOF ¶ 63. CMs undergo five weeks of classroom training before "graduat[ing] to the floor" where they are mentored and continue to take classes. *Id.* ¶ 64.

Dietrich's own contemporaneous communications also reflect that CMs were expected to exercise their own independent judgment in carrying out their job duties. Dietrich's LinkedIn profile indicates that she was "highly effective at ensuring customer satisfaction by problem

solving issues" and had "the ability to work independently . . . ." SOF ¶ 72.; *see also Piscione*, 171 F.3d at 537 (affirming summary judgement for employer where plaintiff's resume described performance of job duties involving discretion and independent judgment); *Spinden v. GS Roofing Prod. C*o., 94 F.3d 421, 423 (8th Cir. 1996) (same).

Finally, employees in the CM positions had the potential to significantly impact the business operations of both CHRW and its customers. Poor discretionary decisions in selecting and hiring an appropriate carrier, resolving a customer's shipping problem, or valuing a shipment could result in claims by customers, financial loss, and reputational harm to both CHRW and its customers. SOF ¶¶ 75-77. Dietrich admitted that, if a load is not delivered on time, "a warehouse could shut down and it could be a nightmare." *Id.* ¶ 76. Thus, the undisputed material facts show that performing the duties of the CM positions required discretion and independent judgment on matters of significance.

Consistent with the above case law authority and the undisputed record, the Court should grant summary judgment in CHRW's favor and find as a matter of law that Dietrich and employees in the CM positions fall within the administrative exemption.

## III. PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED AS TO COUNT I BECAUSE THE UNDISPUTED MATERIAL FACTS SHOW THAT THERE WAS NO WILLFUL VIOLATION OF THE FLSA

Independent of the fact that Count I and Count II fail in their entirety because the CMs were properly classified as exempt, CHRW is entitled to partial summary judgment on Count I insofar as it seeks a three-year statute of limitations period because the undisputed material facts fail to show that CHRW acted willfully in classifying the CM positions as exempt.

In order to expand the FLSA's usual two-year statute of limitations to three years, a plaintiff must show that the employer's violation was willful – that is, the employer "either knew

or showed reckless disregard for the matter of whether its conduct was prohibited by statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Absent evidence supporting such a showing, summary judgment for the defendant is appropriate. *See Howard v. City of Springfield, Ill.*, 274 F.3d 1141, 1145 (7th Cir. 2001) (affirming district court's grant of summary judgment where no evidence supported an inference of willfulness).

Here, Dietrich can point to no evidence supporting her willfulness claim. The Complaint merely alleges that CHRW's "violation of the FLSA is willful, repeated and intentional." Compl. ¶ 67. Yet, nothing in the record even hints that CHRW "knew or showed disregard for the matter of whether its conduct was prohibited by statute." As discussed above, the CMs' job description contained multiple items indicative of employees who met the criteria for administrative exemption. Dietrich's annual performance reviews also suggest that she and CMs were expected to perform exempt duties. As such, CHRW had every reason to believe that CMs were performing work that qualified them for the administrative exemption.

## IV. PLAINTIFF'S GENDER AND DISABILITY DISCRIMINATION CLAIMS IN COUNT III AND COUNT IV FAIL AS A MATTER OF LAW

Dietrich alleges that she was treated less favorably than her male and non-disabled counterparts, which ultimately led to her constructive discharge and violations of Title VII and the ADA. Compl. ¶¶ 92-115. Because Dietrich has not produced any direct evidence of gender or disability discrimination, the *McDonnell Douglas* burden shifting framework applies to Dietrich's Title VII and ADA claims.[7] *Sun v. Bd. of Trustees of Univ. of IL*, 473 F.3d 799, 814

---

[7] To prove that an employee was denied a reasonable accommodation by her employer, the employee must demonstrate, among other things, that her employer failed to provide a reasonable accommodation. *See Isbell v. John Crane, Inc.*, 30 F.Supp.3d 725, 733 (N.D. Ill. 2014). Although Dietrich originally alleged that CHRW ignored her request for a standing desk, she later admitted that those allegations were false and that CHRW, did, in fact, provide her the standing desk she requested. (SOF ¶ 118.) Thus, by Dietrich's own admission, Dietrich's failure to accommodate claim fails.

(7th Cir. 2007); *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 685 (7th Cir. 2014). To establish *prima facie* claims under Title VII and the ADA using the indirect method, Dietrich must establish that: (i) she is a member of a protected class; (ii) she was meeting CHRW's legitimate performance expectations; (iii) she suffered an adverse employment action; and (iv) she was treated less favorably than similarly situated individuals outside of her protected class. *Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 666 (7th Cir. 2008); *Bunn*, 753 F.3d at 685.

Once a showing is made, the burden shifts to CHRW to articulate a legitimate, non-discriminatory reason for its actions. *Sun*, 473 F.3d at 814; *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). CHRW's burden is one of production, not persuasion; the burden of persuasion remains with Dietrich throughout. *South v. Illinois Envtl. Prot. Agency*, 495 F.3d 747, 751-52 (7th Cir. 2007). If CHRW articulates a legitimate, non-discriminatory reason for its actions, the burden shifts back to Dietrich to offer evidence that the explanation is pretextual. *Id.*; *Lumpkins-Benford v. Allstate Ins. Co.*, 987 F. Supp. 2d 807, 819-21 (N.D. Ill. 2013); *Dickerson*, 657 F.3d at 601.

Here, the undisputed material facts demonstrate that Dietrich cannot establish a *prima facie* case for her gender and discrimination claims.

**A. Dietrich Was Not Meeting CHRW's Legitimate Expectations**

The undisputed material facts demonstrate that Dietrich was repeatedly reprimanded for not complying with her team's policies and that she was placed on a Performance Improvement Plan ("PIP") because of a series of operational mistakes she made over the course of a month. SOF ¶¶ 96-99. Dietrich admitted that none of the issues raised in her PIP were "unfounded." *Id.* ¶ 98. Although Dietrich alleged that those issues were "trivial," Compl. ¶ 29, she later admitted that two out of the five issues were not trivial. *Id.* Regardless, Dietrich's personal beliefs that her performance assessments were not justified are "insufficient to raise a genuine issue of material

fact whether she was meeting [CHRW's] legitimate job expectations…." *Watts v. SBC Servs., Inc.*, No. 05 C 3111, 2006 WL 2224054, at *5 (N.D. Ill. July 31, 2006); *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001) ("employee's perception of his own performance . . . cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities"). The undisputed material facts thus contextualize CHRW's actions and demonstrate that Dietrich cannot establish this element of her *prima facie* case.

**B. Dietrich Did Not Suffer An Adverse Employment Action Or Constructive Discharge**

An adverse employment action is "more than a mere inconvenience of an alteration of job responsibilities." *Henyard v. MV Transportation*, No. 15 C 10835, 2019 WL 1399953, at *4 (N.D. Ill. Mar. 28, 2019). Plaintiffs must identify a "quantitative or qualitative change in the terms or conditions of employment." *Palermo v. Clinton*, 437 F. App'x 508, 510 (7th Cir. 2011).

Dietrich alleges that, because of her gender and disability, Herchenroether and/or CHRW: (1) placed her on a PIP and verbally reprimanded her on May 18, 2017; (2) required her to follow Herchenroether's policy of identifying known consolidators on freight being shipped Full Truckload; (3) shut down her largest account, O'Hare Cold Storage ("O'Hare"), and prevented her from booking "auto-assigns" on that account; (4) denied her request for an assistant; (5) denied her a discretionary stock bonus; (6) denied her request for a standing desk related to her hip surgeries; (7) ignored her complaints regarding allegations of sexual harassment against a dispatcher working for O'Hare; and (8) generally created a hostile workplace environment. Compl. ¶¶ 22-47.

The undisputed material facts demonstrate that several of these allegations are factually unsupported or have been recanted by Dietrich[8] and the remaining allegations simply do not

[8] Dietrich admitted that she was provided a standing desk and concedes that claim was "an error." SOF ¶ 114. Dietrich admitted that CHRW resolved her sexual harassment complaint. *Id.* ¶ 133. It is undisputed

constitute an adverse employment action. Dietrich's PIP and verbal reprimand are not adverse employment actions as a matter of law. Dietrich's PIP was designed to facilitate a transparent discussion with her about deficiencies in her job responsibilities in order to provide clarity regarding expectations moving forward. *Id*. ¶ 100; *see Fields v. Bd. of Educ. of City of Chicago*, 928 F.3d 622, 626 (7th Cir. 2019) (negative performance reviews and PIPs are not "adverse employment actions"). *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (collecting cases) (unfair discipline, letters of warning, and reprimands are not adverse actions).

The decisions to deny Dietrich a discretionary bonus and an assistant are also not actionable adverse employment actions. The undisputed material facts show that Dietrich was not entitled to either, and Dietrich concedes that these decisions were discretionary. *Id.* ¶¶ 106-112. As such, CHRW's refusal to grant these benefits is not an adverse employment action. *See Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1033 (7th Cir. 2004) ("[A]n adverse employment action does not include an employer's refusal to grant an employee a discretionary benefit to which she is not automatically entitled.").

Likewise, no jury could conclude on these undisputed facts that Dietrich's working conditions were hostile or that the requirement to identify known consolidators materially changed the terms or conditions of Dietrich's employment. First, Dietrich vaguely asserts that she "felt" like Herchenroether was retaliating and had a "vendetta" against her, and that "he was always watching [her]." *Id*. ¶ 137. Dietrich's beliefs, however, are factually unsupported and do not amount to an actionable adverse employment action. *See Griffin*, 356 F.3d at 829 ("General hostility and comments do not qualify as actionable adverse employment actions unless the

---

that the O'Hare account was not "shutdown" and, even if it had been shut down, Dietrich conceded she would not have been financially impacted because she was on leave at the time. *Id.* ¶¶ 120-129.

hostility was severe and pervasive."); *Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir. 1997) (plaintiff did not suffer a materially adverse employment action when her boss "yelled at her [and] did not make her feel as if she was part of the work group…"). Second, the requirement to identify known consolidators was, at most, a mere inconvenience, which does not constitute an adverse employment action. *See Roney v. Illinois Dep't of Transp.*, 376 F. Supp. 2d 857, 865 (N.D. Ill. 2005), *aff'd,* 474 F.3d 455 (7th Cir. 2007) ("[M]ere inconveniences or alteration of job responsibilities" are not "sufficient to constitute adverse employment actions.").

Dietrich's constructive discharge claim fails for these same reasons and for the additional reason that Dietrich denied CHRW a reasonable opportunity to work out the issues she raised before voluntarily resigning. SOF ¶¶ 138-145. "'An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged.'" *Roney,* 376 F. Supp. 2d at 877 n.27; *Ulichny v. Merton Cmty. Sch. Dist.*, 249 F.3d 686, 704 n.16 (7th Cir. 2001) (citation omitted); *Grube v. Lau Indus., Inc*., 257 F.3d 723, 728 (7th Cir. 2001) (Absent extraordinary conditions, an employee is to remain on the job while seeking redress.).

Here, the undisputed material facts show that CHRW immediately began investigating Dietrich's complaint to HR and was still trying to resolve her concerns when she resigned two weeks after returning to work. SOF ¶¶ 138-144. Tellingly, Dietrich rejected CHRW's attempts to schedule a call with her to discuss her complaint. *Id.* ¶ 140. Instead, Dietrich preferred to hide behind written exchanges. *Id.* ¶ 141. Hence, Dietrich was not genuinely interested in gaining assistance but in papering a future lawsuit. *Id*. In fact, Plaintiff filed her EEOC charge roughly three weeks after first raising her complaints to CHRW and roughly one week after she had returned to work from leave. *Id*. ¶ 141. Dietrich's claim that she was constructively discharged on June 1, 2017, is further undercut by the fact that she had already accepted a job with Uber

Freight in mid-March of 2017. *Id.* ¶ 130. At the end of the day, no trier of fact could conclude that Dietrich was forced to resign because of her alleged discriminatory work environment, which "must be even more egregious than the high standard for hostile work environment.'" *Duncan v. Thorek Memorial Hosp.*, 784 F.Supp.2d 910, 922 (N.D. Ill. 2011) (quoting *Tutman v. WBBM–TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000)).[9]

**C. The Undisputed Material Facts Show That Similarly-Situated Male Or Non-Disabled Employees Were Not Treated More Favorably Than Dietrich**

To show that employees are similarly-situated, a plaintiff must show that the comparators: (i) dealt with the same supervisor, (ii) were subject to the same standards, and (iii) engaged in similar conduct without differentiating or mitigating circumstances to distinguish their conduct or the employer's treatment of them. *Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 507 (7th Cir. 2017); *Keen v. Teva Sales & Mktg., Inc.*, 303 F. Supp. 3d 690, 733 (N.D. Ill. 2018). The undisputed material facts establish that Dietrich cannot do so.

First, Herchenroether placed three male employees on five separate PIPs during the same period that he placed Dietrich on a PIP.[10] SOF ¶¶ 103-104. Second, as to Dietrich's allegation that she was reprimanded by Herchenroether in his office, there is no evidence that male or non-disabled employees on Herchenroether's team did not experience similar treatment. Third, Herchenroether's requirement to identify known consolidators when booking Full Truckload shipments applied equally to all members of his team, regardless of gender or disability, and

[9] Dietrich admitted the decision to limit O'Hare to LTL booking was not discrimination against her, but "that it was discrimination against [the] account" and that she does not think the decision "was because of [her] hip surgery." SOF ¶ 126-27. Dietrich also admitted that she does not believe that Herchenroether "humiliated [her] and berated [her on May 18, 2017] because of her torn labrum." *Id.* ¶ 135.

[10] There is no evidence that Dietrich was disabled at the time she was placed on her PIP; she was placed on a PIP nearly four months before she went on leave. SOF ¶¶ 96, 113. Likewise, Dietrich was required to comply with Herchenroether's policy of identifying known consolidators long before she went on leave. *Id*. Also, Dietrich was denied an assistant long before she claims she was disabled. *Id*. ¶¶ 113, 105.

Dietrich admitted that she did not look at every load booked by her male counterparts to see whether they followed this policy, or know whether they were disciplined when not following this policy. *Id*. ¶¶ 89-93.

In addition, Dietrich's allegation that CHRW "shut down" O'Hare – her biggest account – does not align with the undisputed material facts. O'Hare was not "shut down" but simply limited to only LTL (Less Than Truckload) bookings, and this limitation applied to all members of Herchenroether's team, male or female. *Id*. ¶¶ 119-121. Moreover, this limitation was instituted because the owners of O'Hare were caught lying directly to Herchenroether about consolidating the load of a customer who paid for Full Truckload. *Id*. ¶¶ 116-125. There is no evidence that similarly situated male or non-disabled employees were permitted to continue booking Full Truckloads on carriers that had lied to a manager about consolidating.

The undisputed material facts also demonstrate that Dietrich has no evidence of similarly situated males or non-disabled members on Herchenroether's team who were assigned assistants or provided discretionary stock bonuses. *Id*. ¶¶ 110, 112. In fact, no other male CAM on Herchenroether's team received a discretionary stock bonus for the 2016 year, because CAMs like Dietrich, as she admitted, did not qualify for such a bonus. *Id.* ¶ 111.

**D. CHRW Had Legitimate Business Reasons For Its Actions**

Even if Dietrich could establish her *prima facie* case for gender or disability discrimination, the undisputed material facts demonstrate that each of CHRW's decisions are supported by well-documented, legitimate, non-discriminatory reasons.

First, Herchenroether's policy requiring team members to identify known consolidators when booking freight, and the subsequent decision to limit O'Hare to LTL freight, were based on customer concerns. *Id*. ¶¶ 82-93, 116-125. Dietrich admitted that consolidating loads cheats CHRW's customers, risks CHRW reputational and financial harm, and increases the risk that

freight is damaged or delayed. *Id*. ¶ 85-87. Recognizing these issues, and to provide transparency to the customer, Herchenroether instituted a policy for his *team* to inform the Customer Representative – via a note in the system – that a known consolidator was booked on the load and that the load should not be consolidated. *Id*. ¶ 88.

In addition, Herchenroether caught the owner of O'Hare lying to him about not consolidating shipments *Id*. ¶ 116. Following this incident, O'Hare's owners attended a meeting with CHRW management, during which O'Hare's owners admitted that O'Hare consolidates every Full Truckload shipment. *Id*. ¶ 116-129. Herchenroether believed that O'Hare's dishonest and unethical conduct was a "game changer," and that such behavior should not be tolerated from any carrier working with CHRW. *Id*. A decision was therefore made by the leadership of the Chicago Central Office, in conjunction with Herchenroether, that his team would only utilize O'Hare for LTL freight. *Id*.

Second, Herchenroether's decision to verbally reprimand Dietrich on May 18, 2017 was based on a legitimate, non-discriminatory reason. The undisputed material facts establish that Dietrich was verbally reprimanded because she refused the request of a Customer Representative to remove O'Hare as the carrier on a load she had booked. *Id.* ¶¶ 134-137.

Third, Dietrich was denied an assistant and a discretionary stock bonus based on legitimate, non-discriminatory reasons. *Id.* ¶¶ 105-112. The undisputed material facts establish that neither Dietrich's volume nor her leadership skills qualified her for an assistant. *Id.* ¶¶ 106-108. Herchenroether's comments in Dietrich's 2015 Year-End Performance Review substantiate her leadership shortcomings. *Id.* ¶ 109. Finally, Dietrich did not receive a discretionary stock bonus from 2016 because she was a CAM in 2016, and it is undisputed that only SCAM's on Herchenroether's team were eligible for discretionary stock bonuses. *Id.* ¶¶ 110-112.

Based on the above undisputed material facts, CHRW has met its burden of producing a legitimate, non-discriminatory reason for its decisions relating to Dietrich's employment.[11]

**E. There Is No Disputed Material Fact Refuting CHRW's Legitimate Business Reasons**

Because the undisputed material facts show that CHRW has set forth legitimate business reasons for its actions, Dietrich must establish that CHRW's proffered reasons are mere pretext for discrimination. *See Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 412 (7th Cir. 2018). To establish pretext, Dietrich must prove that: (i) CHRW's explanation has no basis in fact; (ii) its explanation was not the real reason for CHRW's employment actions; or (iii) that the stated reason was not sufficient to justify the employment actions. *Atanus v. Perry*, 520 F.3d 662, 674 (7th Cir. 2008). The main inquiry in determining pretext is whether the employer "honestly acted" on the stated reason – not "whether the reason for the [adverse employment action] was a correct business judgment." *Id.*

Dietrich cannot meet this burden. The undisputed material facts do not establish any genuine issue as to pretext or as to CHRW's "honest" belief that its actions were justified. Dietrich admitted that none of the issues identified in her PIP were "unfounded." SOF ¶ 98. Dietrich also admitted that Herchenroether was involved in the decision to limit O'Hare to LTL because he was concerned about O'Hare's performance, and that its conduct "could potentially ruin his reputation." *Id.* ¶ 125. Worse for Dietrich, she admitted that the decision to limit O'Hare to just LTL is not an example of discrimination against her, but "that it was discrimination against the[e] account." *Id.* ¶ 126. Finally, Dietrich admitted that she would have been okay with Herchenroether's policy to identify known consolidators if it had applied to other teams. *Id.* ¶ 90.

---

[11] Dietrich was placed on a PIP for legitimate, non-discriminatory reasons. *See supra* V.A.

These admissions make it clear that Dietrich cannot raise a genuine issue of material fact that CHRW did not "act honestly and in good faith." *See Atanus*, 520 F.3d at 674 (finding plaintiff "offers nothing more than her belief that her conduct . . . did not warrant a ten-day suspension to show that the GSA did not act honestly and in good faith"); *Fane v. Locke Reynolds*, 480 F.3d 534, 541 (7th Cir. 2007) (affirming summary judgment where the employer believed that such conduct warranted termination and honestly acted pursuant to that belief).

In sum, no reasonable juror could find that CHRW's and Herchenroether's stated reasons have no basis in fact, are not the real reasons for their actions, or that Dietrich's conduct was insufficient to warrant those actions. *Alek v. Univ. of Chicago Hospitals*, 54 F. App'x 224, 226 (7th Cir. 2002) (summary judgment where no evidence that the explanations had no basis in fact, were not the real reason for the decision, or were insufficient to motivate the employer's action).

## V. BASED ON THE UNDISPUTED MATERIAL FACTS, PLAINTIFF'S RETALIATION CLAIMS IN COUNTS V AND VI FAIL AS A MATTER OF LAW

Dietrich's retaliation claims fail because the undisputed material facts show that she did not suffer an adverse employment action, and that there is no causal connection between that action and her protected activity. "To succeed on a claim for retaliation, whether related to alleged disability or gender discrimination, 'a plaintiff must demonstrate that she engaged in protected activity, that she suffered an adverse action, and that there is a causal connection between the two."' *Keen*, 303 F. Supp. 3d 690, 734 (N.D. Ill. 2018) (quoting *Rodrigo v. Carle Found. Hosp*., 879 F.3d 236, 243 (7th Cir. 2018)).

Dietrich contends that Herchenroether retaliated against her on May 18, 2018 by verbally reprimanding her. No reasonable juror could conclude that this sole purported evidence of retaliation is materially adverse to a reasonable employee. *See Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 382 (7th Cir. 2020) (employer's actions must be materially adverse to a

reasonable employee). Indeed, courts have found that this type of verbal reprimand, without more, is not an adverse employment action. *See Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016) ("Unfair reprimands . . . unaccompanied by tangible job consequences, do not suffice…"); *Noble v. Northeast. Illinois Reg'l Commuter R.R. Corp.*, 130 F. Supp. 3d 1166, 1177 (N.D. Ill. 2015) ("a reprimand 'without more' is not an adverse employment action.") (citation omitted).

Moreover, even if Dietrich's reprimand constituted an adverse employment action, the undisputed material facts show that her formal complaint on May 2, 2017 did not *cause* that reprimand. *Kotaska v. Fed. Express Corp.*, No. 16-CV-9321, 2018 WL 3993722, at *16 (N.D. Ill. Aug. 21, 2018) ("A retaliation claim requires proof of but-for causation."). *Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 562-63 (7th Cir. 2007) (The causation standard is generally the same for ADA and Title VII retaliation claims). During her reprimand, Herchenroether never mentioned Dietrich's HR complaint. SOF ¶ 134. Dietrich's only evidence of a causal connection is her belief that Herchenroether seemed upset. *Id.* ¶ 135. Such speculation, however, is insufficient to create a question of material fact. *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016) (court may not draw inferences that are "supported by only speculation or conjecture"); *Sauzek v. Exxon Coal USA, Inc*., 202 F.3d 913, 918 (7th Cir. 2000) (a plaintiff must go beyond "[s]peculation" and "produce facts which somehow tie the adverse decision to the plaintiffs' protected actions"). Based on these undisputed material facts, Dietrich cannot establish a *prima facie* case of retaliation.

Even assuming that Dietrich can establish a *prima facie* case of retaliation under Title or the ADA, these claims nevertheless fail. As discussed in section V.D, the undisputed material facts establish that CHRW had legitimate, non-discriminatory reason for why Dietrich was reprimanded by Herchenroether on May 18, 2017, and Dietrich is unable to raise a genuine issue

of material fact to show that CHRW's reasons are pretext for discrimination. *See supra* section V.E; *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). Similar to her discrimination claim, no reasonable juror could conclude that CHRW or Herchenroether's stated reasons can be characterized as a falsehood rather than an honestly-held belief. *Harper v. C.R. England, Inc*., 687 F.3d 297, 311 (7th Cir. 2012) ("[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason…."). Accordingly, summary judgment on Dietrich's retaliation claims is proper.

## VI. CONCLUSION

For the forgoing reasons, CHRW respectfully requests that the Court grant partial summary judgment in its favor, and enter an order dismissing Plaintiff's claims in Count's III through VI in their entirety, and finding that, as a matter of law, Plaintiff and employees in the CM job positions were properly classified as exempt.

DATED: December 4, 2020

Respectfully submitted,

By: */s/ Gerald L. Maatman, Jr.*

Gerald L. Maatman, Jr.
Michael L. DeMarino
Andrew D. Welker
SEYFARTH SHAW LLP
233 South Wacker, Suite 8000
Chicago, IL 60606
Phone: 312-460-5000
Fax: 312-460-7000
gmaatman@seyfarth.com
mdemarino@seyfarth.com
awelker@seyfarth.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2020, a true and correct copy of the foregoing document was filed electronically through the Court's CM/ECF system, and therefore, will be transmitted to all counsel of record by operation of the Court's CM/ECF system.

*/s/ Gerald L. Maatman, Jr.*
Gerald L. Maatman, Jr.