IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **Taryn Dietrich, on behalf of herself and a class of all those similarly situated,** ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> **C.H. Robinson Worldwide, Inc.,** ) <br> Defendant. ) | ) <br> ) <br> ) <br> **No. 18 C 4871** <br> ) <br> **Judge Ronald A. Guzmán** <br> ) <br> ) |

### MEMORANDUM OPINION AND ORDER

For the reasons stated below, C.H. Robinson Worldwide, Inc.'s ("CHRW") motion for partial summary judgment [201] is denied in part and granted in part. As to whether CHRW is entitled to the administrative exemption under the Fair Labor Standards Act ("FLSA") and the Illinois Minimum Wage Law ("IMWL"), the motion is denied. With respect to Plaintiff's individual discrimination claims, the motion is granted. The parties are directed to confer within 10 days of the date of entry of this order to discuss potential trial dates. No more than 14 days from the date of entry of this order, the parties are to submit a joint statement with three proposed trial dates in October and November 2022. The statement shall also include an estimated length for the trial.

### STATEMENT

**Facts**

The Court assumes familiarity with the facts of the case and the Court's prior orders. CHRW, a global provider of transportation services and logistics solutions, hired Plaintiff as a Carrier Account Manager in June 2013. She was employed until June 1, 2017, when she was purportedly constructively discharged. Plaintiff alleges that CHRW failed to pay her and those similarly situated[1] overtime for regularly working more than 40 hours per week, in violation of the FLSA and IMWL (Counts I and II). Plaintiff also brings the following discrimination claims: gender discrimination under Title VII (Count III); disability discrimination under the Americans with Disabilities Act ("ADA") (Count IV); retaliation under Title VII (Count V); and retaliation under the ADA (Count VI). Additional facts will be discussed as necessary in the Analysis section of this order.

CHRW moves for partial summary judgment on the FLSA and IMWL counts, contending that Plaintiff and those similarly situated were properly classified as administratively

---

[1] These individuals include Carrier Account Managers, Capacity Account Managers, Capacity Key Account Managers (collectively "CAMs"), and Senior Carrier Account Managers ("SCAMs"), who are referred to collectively as Carrier Managers ("CMs").

exempt from the statutes' overtime requirements. CHRW also moves for summary judgment on Plaintiff's individual discrimination claims.

**Standard**

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted).

**Analysis**

    A.  FLSA and IMWL[2]

The FLSA exempts from its overtime-pay requirement those employed in an "administrative . . . capacity." 29 U.S.C. § 213(a)(1). The regulations set forth a three-part test for determining whether an employee falls under the administrative exemption. First, the employee must be compensated on a salary basis at a rate of not less than $455.00 per week. 29 C.F.R. § 541.200(a)(1). Second, the employee's primary duty must be the performance of office or non-manual work "directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). Finally, the employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a)(3). CHRW argues that Plaintiff[3] meets these elements and thus qualifies for the administrative exemption.

As to the first element—rate of compensation—Plaintiff does not dispute that CHRW has satisfied it; thus, the Court considers this issue resolved. With respect to the second element, Plaintiff contends that genuine issues of material fact exist as to whether the relevant employees' primary duty was the "performance of work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.201. An employee's primary duty is the "principal, main, major or most important duty that the employee performs." *Id*. § 541.700. For a primary duty to be administrative, it must be "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Bigger v. Facebook*, 947 F.3d 1043, 1053 (7th Cir. 2020); *see also* 29 C.F.R. §

---

[2] The IMWL also exempts from its overtime requirements employees who are employed in an administrative capacity and applies the exemption "as defined by or covered by the [FLSA] and the rules adopted under the [FLSA], as both exist on March 30, 2003." 820 ILCS 105/4a(2)E. Accordingly, the Court refers only to the FLSA and its regulations.

[3] In discussing the administrative exemption, the Court refers to Plaintiff in the singular, but notes that the analysis applies to all class and collective-action members.

541.205(b) (administrative operations of a business include "work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control"). "[W]hen an employee is engaged in the core function of a business, his or her task is not properly categorized as administrative." *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560 (7th Cir. 2012).

According to CHRW, because CMs provide an administrative service to their customers by advising on carrier market conditions and securing appropriate capacity, they operate in an administrative capacity. *See* 29 C.F.R. § 541.201(c) ("An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations *of the employer's customers*. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.") (emphasis added). CHRW contends that its "customers are companies like 'Procter & Gamble or Johnson & Johnson that have product that needs to be moved across the country,'" and CMs "service these companies by advising them on their supply[-]chain requirements, locating carriers to ship their products, negotiating rates for those shipments, and then overseeing and troubleshooting the process." (Def.'s Mem. Law Supp. Mot. Partial Summ. J., Dkt. # 202, at 7) (internal citation omitted). CHRW asserts that the administrative exemption applies because "CMs rely on their expertise of the carrier market to provide CHRW's customers with logistics services that the customer does not provide 'in-house' itself." *See Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865 (7th Cir. 2008) (rejecting the position of plaintiffs, who were claims adjusters, that they were engaged in nonexempt "post-industrial" production work because, the court concluded, the employer-defendant's "customers are insurance companies in the business of selling policies, and employees who process claims against those policies are performing an administrative function for [the defendant's] customers (i.e., a task that administers the policies "produced" by the insurers)"); *see also Adams v. BSI Mgmt. Sys. Am., Inc.*, No. 1:11-CV-2914-ODE, 2013 WL 1215000, at *7 (N.D. Ga. Feb. 12, 2013) (stating that had plaintiff been hired by one of the customers to provide in-house security analysis, then "she would clearly be exempt as performing work related to the company's general business operations; therefore, as an outside consultant performing the same work, she is also exempt").

But CHRW's characterization of the issue glosses over the role that booking freight (i.e., selling space on trucks) plays in assessing the CMs' function within CHRW. It is true, as CHRW contends, that if CMs worked for a non-logistics company and their only tasks were to locate carriers for product, negotiate rates and oversee or troubleshoot the process, then they might be properly categorized as administratively exempt because they would provide administrative support to the company. But, according to Plaintiff, CHRW's core function (and the CMs' primary duty) is sales; thus, they are not administratively exempt. In support of her position regarding the CMs' primary duty, Plaintiff points to the following facts:

- CHRW General Manager Eric Herchenroether stated as to CAMS and SCAMS: "[T]hey're all salepeople. They sell different ways. Their styles are different." (Pl's. Stmt. Add'l Facts, Dkt. # 218, ¶ 6.)

3

- CHRW requires job applicants to undergo twenty-minute "sales scenarios" and targets new hires with an aptitude for sales. (*Id*. ¶ 7.)
- CHRW management sets volume and revenue sales goals for CAMs and SCAMs and monitors those numbers closely. (*Id*. ¶ 8.)
- Volume and revenue numbers are used to determine which employees would be promoted; for instance, Carrier Representatives (also known as Buyers and Assistant Carrier Account Managers) are promoted to CAM status once their sales meet a financial threshold. (*Id*.)
- SCAMs who did not meet their sales goals were returned to CAM status. (*Id*. ¶ 11 (Herchenroether testified that "every year[,] some go up, some go down").)
- SCAMs were eligible to receive additional compensation in the form of stock shares with their promotions and, in some cases, were assigned an assistant to help them track loads so the SCAMs could focus on selling. (*Id*. ¶¶ 12, 14 (Herchenroether testified that CHRW assigned assistants to SCAMS because "we want the – the SCAMS selling as much as possible").)
- As stated by Herchenroether, CHRW's general managers are "under so much stress to grow, grow, volume, revenue, every year, no stop . . . . We kill each other to be the high producers." (*Id*. ¶ 13.)

Because a genuine issue of material fact exists as to the CMs' primary duty, summary judgment is inappropriate, and CHRW's motion for summary judgment as to whether the CMs are administratively exempt from the FLSA's overtime requirement is denied. *Roe-Midgett,* 512 F.3d at 869 ("Determining the duties encompassed by an employee's position is a question of fact . . . .").

B. <u>Individual Gender- and Disability-Discrimination Claims</u>

During her employment with CHRW, Plaintiff was managed and supervised by Herchenroether, who was responsible for a team or "pod" of individuals. As a CAM, Plaintiff booked loads with five or six different carriers, but her biggest account was the O'Hare Cold Storage account ("O'Hare"), which was given to her by Herchenroether. The O'Hare Account represented approximately 80% of Plaintiff's business at CHRW. Plaintiff admits that she and Herchenroether had discussions about diversifying her portfolio, including during her 2015 and 2016 year-end performance reviews.

Plaintiff has a congenital condition that resulted in torn labrums in both hips. After having surgery in December 2016 to repair one hip, she returned to work for one week, but found that she needed more time to heal. She went on leave again and had a second surgery in April 2017 to repair the other hip. While she was on leave, she was officially promoted to the position of SCAM. Plaintiff returned to work on May 18, 2017, and her last day of work for CHRW was June 1, 2017.

Plaintiff alleges that she was treated less favorably than her male and non-disabled counterparts, which ultimately led to her constructive discharge. "A plaintiff seeking to recover

4

for disparate treatment under [Title VII and the ADA] must prove . . . , by a preponderance of the evidence, that her . . . gender [or disability] caused the challenged adverse employment action." *Haag v. Cook Cnty.*, No. 17 C 5403, 2021 WL 1192440, at *5 (N.D. Ill. Mar. 29, 2021); *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014). "For summary judgment, [the Court] ask[s] 'whether the evidence would permit a reasonable fact-finder to conclude that [Plaintiff] was subjected to an adverse employment action based on a statutorily prohibited factor—here, [gender and disability].'" *Logan v. City of Chi.,.*, --- F.4th ---, 2021 WL 2946431, at *4 (7th Cir. July 14, 2021). "Whether a plaintiff offers direct or circumstantial evidence of discrimination, [the Seventh Circuit] made clear in [*Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016)] that 'all evidence belongs in a single pile and must be evaluated as a whole.'" *Id*. (citation omitted and second alteration in *Logan*). "One way of proving employment discrimination under Title VII remains the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Id*.[4] Nevertheless, "[t]he Seventh Circuit has cautioned against adhering too strictly to any one test or analysis, lest it screen out valid claims of discrimination based on circumstantial evidence that does not fit neatly within a certain framework." *Haag*, 2021 WL 1192440, at *6.

Plaintiff contends that she suffered two adverse employment actions. First, while on leave after her initial hip surgery, Herchenroether restricted Plaintiff's largest account, O'Hare, to only less-than-truckload ("LTL") shipments,[5] which, she asserts, "decimated" her business.

---

[4] As noted by another court in this district:

> In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court established the now-familiar *prima facie* framework for evaluating a plaintiff's disparate[-]treatment claims. As an initial step, [the plaintiff] must establish a *prima facie* case that the [defendant] discriminated against her based on her race, national origin, gender, or age. If she can do so, then the burden shifts to the [defendant] to offer a legitimate, nondiscriminatory reason for its actions. Assuming the [defendant] meets that burden, then [the plaintiff] must show that the reason is pretext, that is, it is a cover-up of a discriminatory motive.

*Haag,* 2021 WL 1192440, at *6 (citations omitted).

[5] Freight was booked as either full truckload ("TL" or "FTL"), meaning that only one shipment was placed in a truck, or less-than-truckload ("LTL"), in which several different shipments were consolidated into a truckload. LTL shipments were more cost-efficient for a shipper, but also presented a greater risk of loss or damage to the freight because LTL shipments were often repacked several times during a trip. (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 219, ¶ 83.) Plaintiff admitted that while customers pay a premium to ship their freight TL, sometimes carriers would consolidate a load without telling the customer. (*Id*. ¶ 85.) Plaintiff admitted that O'Hare did this, and that CHRW referred to such companies as "known consolidators." (*Id*.) If carriers consolidate TL shipments, Herchenroether testified that the results can be "catastrophic," causing CHRW to lose customers and exposing it to claims. (*Id*. ¶ 87.) Plaintiff admitted that Herchenroether required his team to make a notation in the booking system when a TL shipment was being booked with a known consolidator and to indicate that the shipment was not to be

*See Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002) (examples of adverse employment actions include "economic injuries such as dismissal, suspension, failure to promote, or diminution in pay"). Second, she contends that this restriction and Herchenroether's alleged harassment left her no choice but to quit, thus resulting in her constructive discharge. *See Tubbs v. Chi. Transit Auth.*, No. 20 C 695, 2021 WL 1192676, at *4 (N.D. Ill. Mar. 29, 2021) ("[A] constructive discharge constitutes an adverse employment action.").

As to the restriction on the O'Hare account, Plaintiff states the following facts in support of her position that she survives summary judgment on her gender, disability, and retaliation claims:

> She worked in a male-dominated position and excelled at her job. Yet her supervisor watched her constantly, looking for mistakes. He did not similarly scrutinize the males in his pod. He disparaged [Plaintiff] in emails to others, openly admitting he was singling her out to monitor closely. She was subjected to disparate discipline [by] being placed on a PIP. Her biggest account was rendered useless while she was on disability leave, with the excuse that it was a "known consolidator," despite the fact that male salespeople booked loads with known consolidators with impunity. This move decimated earning potential and, along with Mr. Herchenroether's increasing hostility, forced her to leave the company.

(Pl.'s Mem. Opp'n Def.'s Partial Mot. Summ. J., Dkt. # 217, at 30.)

Plaintiff points to specific comments by Herchenroether, including that he told another manager that a male CAM had grown an account 22% year-over-year and received a 70% commission on that account, while Plaintiff grew her O'Hare account 131% and received only a 60% commission. He went on to state the following about Plaintiff:

> . . . I have zero interest in raising Taryn's commission from 60% to anything [n]orth of that on O'Hare, which she grew 131% YOY from 1899 to 3349 books. The fleet is 76.7% of her total business, she made $183k last year so approximately $140k off the account . . . Your welcome Taryn . . . What do I tell Taryn if she goes ape shit demanding the same?

(*Id.*, at 29 (citing Pls.' Stmt. Add'l Facts, Dkt. # 218, ¶ 46).) Plaintiff also points to another statement by Herchenroether, in which he wrote to a fellow CHRW manager, "I . . . have my boot on Taryn's neck regarding O'Hare on a daily basis and watch our consol report like a hawk, we've got to hold the reps accountable." (*Id.* (citing Pl's. Stmt. Add'l Facts, Dkt. # 218, ¶ 47).) She further notes that Herchenroether denied her request for an assistant, even though male colleagues had assistants, and that on August 12, 2016, Herchenroether placed Plaintiff on a Performance Improvement Plan ("PIP"), citing five operational issues.[6] Herchenroether never

---

consolidated, though she testified there was at least one male who did not follow the rule. (*Id.* ¶ 88; Dietrich Dep., Dkt. # 220-1, at 194-95.)

[6] Plaintiff refers to these as "trivial."

6

lifted the PIP, despite the fact that he rated Plaintiff's performance as 4.15 out of 5 for that year. Nevertheless, Plaintiff was informed in her annual review at the end of 2016 that she was slated to be promoted to SCAM, and the promotion became effective in February 2017, while she was on disability leave.

While Plaintiff generally points to numerous instances of being treated poorly or more harshly than her male colleagues, she fails to detail any evidence from which a factfinder could find that the O'Hare account was restricted (in other words, that the relevant adverse employment action occurred) because of her gender or disability. *See Igasaki v. Ill. Dep't of Fin. & Prof'l Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) (stating that the plaintiff "recites a litany of past wrongs purportedly probative of race or sex discrimination, including mandatory tasks made voluntary for others, increased workload, constant admonishment, arbitrary remote work and identification policies, and general harsh treatment. For [the plaintiff], this disparate treatment is enough to show that the [defendant] terminated him because of his Asian ethnicity or homosexuality. It is not.").

The observation by the *Igasaki* court applies equally here. Herchenroether may have treated Plaintiff callously, but the evidence demonstrates that the restriction on Plaintiff's primary account was wholly unrelated to her gender or disability. It is undisputed that Herchenroether believed that the owner of O'Hare lied to Herchenroether about not having consolidated a shipment. (Pl.'s Resp. Def.'s Stmt. Facts, Dkt. # 219, ¶ 116.) Accordingly, the owners of O'Hare attended a meeting with several of CHRW's employees, including Herchenroether. (*Id*. ¶ 117.) During that meeting, O'Hare's owners admitted that O'Hare consolidates every load, regardless of whether it is designated as TL. (*Id*.) Herchenroether testified that, as a result of O'Hare's admissions, he lost trust in it and decided that his team would no longer utilize O'Hare for anything other than LTL freight. (*Id*. ¶ 119.) Following this decision, other team managers had the discretion to continue to work with O'Hare as they saw fit; however, none of the employees supervised by Herchenroether were permitted to utilize O'Hare for anything other than LTL freight. (*Id*. ¶ 120.) Plaintiff admitted that O'Hare had issues that would cause delays in deliveries more than other carriers because they were consolidating freight. (Dietrich Dep., Dkt. # 220-1, at 133:10-22.) Plaintiff further admitted that there were instances when O'Hare told her that a truck had broken down when it had not, and if O'Hare made a "misrepresentation" to her about a truck breaking down, she addressed it by making a rate cut. (*Id*. at 135:9-12, 140:15-141:1, 141:21-142:1.) Indeed, Plaintiff acknowledged that when she returned from disability leave, Herchenroether told her that "he was not going to allow . . . O'Hare to ruin his reputation." (*Id*. at 233:4-6.) Thus, Plaintiff has failed to point to evidence from which a factfinder could conclude that the O'Hare account was restricted because of her gender.

With respect to her disability, when Plaintiff was asked whether her disability leave was the reason for the restriction, Plaintiff responded: "I don't think it was because of my hip surgery, but I feel that it was a lot easier to have them shut down because I was on disability [leave] . . . ." (*Id*. at 252:5-7.) But a claim for disparate treatment under the ADA requires proof that "disability was the 'but for' cause of [the] adverse employment action." *Scheidler v. Ind.*, 914 F.3d 535, 541 (7th Cir. 2019). Plaintiff fails to make such a showing or create a genuine issue of material fact on this issue.

7

To the extent that Plaintiff seeks to rely on the *McDonnell-Douglas* framework to ward off summary judgment, even assuming arguendo that Plaintiff has made a prima facie showing of gender or disability discrimination, Plaintiff fails to create a genuine issue of material fact as to CHRW's nondiscriminatory explanation for the restriction on the O'Hare account. *See Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002) ("It is not always necessary to march through this entire process if a single issue proves to be dispositive. Here, as is often true, that issue is pretext or the lack thereof."). The Court notes that "a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus." *Chatman v. Bd. of Educ. of City of Chi.*, --- F.4th ---, 2021 WL 3046819, at *5 (7th Cir. July 20, 2021).

As detailed above, CHRW asserts that the O'Hare account was restricted because its representative had lied to Herchenroether and it improperly was consolidating TL shipments. Plaintiff's attempts at demonstrating pretext fail.[7] As an initial matter, Plaintiff admits that she did not know why the O'Hare account was restricted because she was out on leave when it occurred. (Dietrich Dep., Dkt. # 220-1, at 215:20-216:20 ("I know that there was an issue with them consolidating. I don't want to say for certain the exact details or what the exact issue was because I was not in the office.").) Moreover, while Plaintiff contends that known consolidators used by male colleagues were not similarly restricted, of the six men she identified as allegedly booking freight with consolidators, only one was managed by Herchenroether. (*Id.*, at 185 (Q: "So when you say that Mr. Herchenroether was holding you to a higher and different standard than your male counterparts [with respect to noting when they used a known consolidator], you're referring to one person that was supervised by Mr. Herchenroether and five people that Mr. Herchenroether did not supervise?" A: "Yes.").) The one male counterpart in her pod who Plaintiff claims made bookings to a known consolidator was Danny Daoud. The entirety of Plaintiff's testimony on this issue is that she believed the name of Daoud's consolidator was Mirage and that Herchenroether had noted in the electronic booking system that it was a known consolidator. (*Id.*, Dkt. # 220-2, 399:13-400:2.) Plaintiff does not identify any evidence that Daoud actually booked freight with Mirage (assuming that is the relevant consolidator) or that CHRW had had problems with Mirage that were similar to those it had with O'Hare.

Plaintiff also contends CHRW's reason for the restriction is a lie because once she was gone, the rules were relaxed again for the male pod members. But Plaintiff mischaracterizes Herchenroether's testimony on this topic, which was as follows:

> Q. Do you think that O'Hare has been booked by someone in your group in the--let's say the last--since the February 2017 meeting?
> A. On LTL, certainly. On truckload, I--I am not--I--I can't guarantee that they have not.
> Q. Why aren't you monitoring O'Hare anymore to make sure that they don't get used?
> A. I think my team is clear on--on my thoughts of their leadership. We deal with 76,000 carriers. It's--there are a lot of carriers.

---

[7] Plaintiff makes no effort to discuss how she was treated differently from non-disabled employees.

(Herchenroether Dep., Dkt. # 220-9, at 255:10-19.) The question was whether Herchenroether had been monitoring O'Hare *since February 2017*, not immediately after Plaintiff's departure from the company in June 2017. Thus, this testimony provides no support for Plaintiff's contention that the rules were relaxed after she left. Plaintiff also states that "[i]n May 2017, toward the end of [Plaintiff's] leave, Mr. Herchenroether wrote to other managers that he had begun reevaluating O'Hare, noting that other CAMs continued to book truckloads with the company." (Def.'s Resp. Pl.'s Stmt. Add'l Facts, Dkt. # 230, ¶ 57.) This contention is based on an email that Herchenroether sent in May 2017, in which he states:

> Between us gentlemen, [Plaintiff] will be returning to work in the very near future, and I am currently sticking to my guns w/O'Hare and Hubfly going back to our agreement in February. I know she will immediately look at the files for both fleets and question why Sam and Sara [CMs under different managers] are continuing to book both fleets [which presumably were consolidators] and not living up to their side of the bargain. My response would be that I will continue to manage our business in the best interest of our customers and will make decisions that I see fit and that our GMs are able to do the same. [O'Hare] and I will be discussing claims resolution as recently as two hours ago and he wants to meet in the near future, I will let you know that goes, I'm certain that they want to be reinstated[,] which I am neither here nor there on currently.

(Herchenroether Dep., Dkt. # 220-9, at 196.) Again, however, not only does the email not support Plaintiff's position, but it shows that Herchenroether was intent on maintaining the restriction imposed in February 2017, while Plaintiff was on leave and not subject to the restriction. The fact that Herchenroether may have been amenable (i.e., "neither here nor there") to easing the limitation in May 2017, just prior to Plaintiff's return, would likely benefit Plaintiff upon her return, and in no way supports her argument that the business reason for the restriction was a lie.

For these reasons, the Court finds that Plaintiff has failed to create a genuine issue of material fact regarding CHRW's contention that the restriction on the O'Hare account was unrelated to Plaintiff's disability or gender. Summary judgment on the disparate treatment claims is granted.

Neither has Plaintiff set forth sufficient evidence of constructive discharge. "There are two types of constructive discharge: (1) resignation due to discriminatory harassment and (2) resignation based on an employer's communication or action suggesting termination is imminent and inevitable." *Huber v. Fox Valley Park Dist.*, No. 19 C 5337, 2021 WL 1546425, at *2 (N.D. Ill. Apr. 20, 2021). Plaintiff does not rely on the latter, so the Court turns to whether Plaintiff has demonstrated that she was forced to resign due to discriminatory harassment. Plaintiff must show "a discriminatory work environment 'even more egregious than the standard for hostile work environment.'" *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002) (quoting *Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000)). Further, Plaintiff must demonstrate "that the constructive discharge was motivated by discriminatory intent." *Id*. at 333. Plaintiff has done neither.

Although Plaintiff discusses the purported harassing conduct by Herchenroether, Plaintiff makes no effort to demonstrate that her working environment was more egregious than the standard required for a hostile work environment, and it is not this Court's obligation to make Plaintiff's arguments for her. Moreover, while Herchenroether was vocal about his desire to terminate Plaintiff, she points to no evidence that Herchenroether's alleged poor treatment of her was motivated by discriminatory intent. Accordingly, Plaintiff's claim that she was constructively discharged because of Herchenroether's treatment of her is denied.

To the extent Plaintiff claims that she also was constructively discharged as a result of the restriction on the O'Hare account (assuming arguendo that the restriction meets one of the bases for a constructive discharge claim), this contention fails. Plaintiff applied for a job at Uber in January 2017, (Dietrich Dep., Dkt. # 220-1, at 283), before Herchenroether made the change to the O'Hare account in February 2017. Moreover, the restriction occurred while she was on disability leave, and she admits that was not financially adversely affected by the restriction.[8] (*Id.*, at 235:19-236:2.) The Court concludes that no reasonable jury could find that Plaintiff was constructively discharged as a result of the restriction on the O'Hare account.

Retaliation

On May 2, 2017, Plaintiff submitted a detailed written complaint to CHRW's Human Resources Manager, Carmen Smith, stating that she was being held to a higher standard than her male coworkers by Herchenroether and giving multiple examples. Molly Bowling, an Employee Relations Specialist at CHRW, was tasked with investigating Plaintiff's complaint; she decided that no discrimination or retaliation had occurred. Plaintiff filed an EEOC charge on May 26, 2017, alleging discrimination based on sex and disability and retaliation for engaging in protected activity. After Plaintiff submitted her complaint and her EEOC charge, she asserts that Herchenroether's hostility towards her increased and that "she had no choice [but] to resign from CHRW because, after the largest account was disabled, her earning potential dramatically slashed, and Mr. Herchenroether's hostility made it impossible for her to continue." (Pl.'s Resp., Dkt. # 217, at 28.)

To establish a retaliation claim, a plaintiff must demonstrate that "(1) she engaged in a statutorily protected activity, (2) her employer took a materially adverse action against her, and (3) there was a causal connection between the two." *Malin v. Hospira, Inc.*, 762 F.3d 552, 558 (7th Cir. 2014). Plaintiff engaged in statutorily protected activity when she complained to Human Resources and filed the EEOC charge. As noted above, the alleged material adverse actions were the disabling of the O'Hare account and Herchenroether's hostility towards her. Even assuming arguendo that these occurrences constituted materially adverse actions, Plaintiff fails to create a genuine issue of material fact regarding causation. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 578 (7th Cir. 2021) ("To survive summary judgment, [Plaintiff]

---

[8] Plaintiff testified that she heard about employment opportunities at Uber in January 2017. (Dietrich Dep., Dkt. # 220-1, at 283.). After she had phone and in-person interviews, she was offered a job there in March 2017. (*Id.*, at 285). She accepted the job at Uber "not too far away from March 15, [2017, the offer date]" and started there on June 10, 2017. (*Id.*)

must adduce evidence to establish 'a causal link between [her] protected activity and the adverse action.'").

The change in the O'Hare account occurred well before Plaintiff's May 2017 complaint to Human Resources and her EEOC charge, so no causal link exists there. Plaintiff also points to a "paper trail" of emails from Herchenroether to individuals in Human Resources in which he makes such comments as:

- "I mean, we can't fire her while she's out on STD, right? Slippery slope? Perhaps she comes back and makes it easy? Let's talk."
- Next up to bat: could we terminate due to this, or is it too litigious while she is out on short-term disability? Let's talk tomorrow."
- "What's your angle here? Trying to terminate while she is out on STD? What if we investigated if she is currently working somewhere else? Is that completely off the table? If she was working somewhere else, what would we do?"

(Pl.'s Resp., Dkt. # 217, at 35.) Again, however, only the last email cited above occurred after Plaintiff complained to Human Resources. Indeed, the final quote is from Herchenroether's May 3, 2017 response to Carmen Smith's request to Herchenroether, as part of her investigation into Plaintiff's complaint, of his "performance conversations" with Plaintiff.

Plaintiff also refers to the increased hostility exhibited by Herchenroether after she returned to work on May 18, 2017. But one email and a conversation after she returned to work in which Herchenroether supposedly humiliated her and spoke to her disrespectfully are insufficient to demonstrate causation. The question is: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the [purported constructive] discharge?" *Khungar,* 985 F.3d at 578. It does not. The record establishes only that Herchenroether wanted to fire Plaintiff and she took a job at another company well before her protected complaints of discrimination. CHRW's motion for summary judgment is granted as to the retaliation claim.[9]

**Conclusion**

For the reasons stated above, CHRW's motion for partial summary judgment is denied in part and granted in part. As to whether CHRW is entitled to the administrative exemption under the FLSA and the IMWL, the motion is denied. With respect to Plaintiff's individual

---

[9] The Court is aware that "[t]he showing a plaintiff must make to set out an adverse employment action required for a retaliation claim is lower than that required for a discrimination claim" in that "a plaintiff must only show that the employer's action would cause a 'reasonable worker' to be dissuaded from making or supporting a charge of discrimination." *Chaib v. Ind.*, 744 F.3d 974, 986-87 (7th Cir. 2014) (citation omitted). Even assuming this lower standard, Plaintiff's retaliation claim fails.

discrimination claims, the motion is granted. The parties are directed to confer within 10 days of the date of entry of this order to discuss potential trial dates. No more than 14 days from the date of entry of this order, the parties are to submit a joint statement with three proposed trial dates in October and November 2022. The statement shall also include an estimated length for the trial.

**Date:** August 9, 2021

**Ronald A. Guzmán**
**United States District Judge**